**CIGNA GOVERNMENT SERVICES, LLC, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

and

**Noridian Administrative Services, LLC, Intervenor,**

and

**Palmetto GBA, LLC, Interventor.**

No. 06–108C.

United States Court of Federal Claims.

Filed Under Seal March 3, 2006.

Reissued March 10, 2006.[1]

Craig A. Holman and Kara L. Daniels, Holland & Knight, LLP, Washington, D.C., for Plaintiff.

Michael J. Dierberg, Department of Justice, Commercial Litigation Branch, Washington, D.C., for Defendant.

Paul F. Khoury and Daniel P. Graham, Wiley Rein & Fielding, LLP, Washington, D.C., for Intervenor.

Katherine E. Karelis, Jenner & Block, LLP. Washington, D.C., for Intervenor.

**OPINION AND ORDER GRANTING A DECLARATORY JUDGMENT**

WILLIAMS, Judge.

In this post-award bid protest, Plaintiff CIGNA Government Services, LLC (Cigna), challenges an override decision issued by the Department of Health and Human Services Centers for Medicare and Medicaid Services (CMS) in a pending protest at the Government Accountability Office (GAO). This action arises out of CMS' procurement for Medicare claims administration services covering durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS)—the first in a series of procurements conducted under the Medicare Prescription Drug Improvement Modernization Act of 2003, Pub.L. 108–173(MMA) requiring competitive contracting procedures and compliance with the Federal Acquisition Regulation (FAR) to re-

---

1. This opinion was issued under seal on March 3, 2006. The Court invited the parties to submit proposed redactions by March 10, 2006. The parties consulted and submitted proposed redac- tions. The Court accepts and incorporates the parties' redactions in the Opinion and Order issued today. Redactions are indicated by brackets "[ ]."

place existing contracts which had not been subject to the requirements of full and open competition. The solicited services include processing and paying DMEPOS claims, handling first-level appeals of denied claims, and serving as the primary contact with CMS for providers. The solicitation included four separate geographic jurisdictions for award designated as A, B, C and D. At issue here are the awards in Jurisdictions C and D.

Under the Competition in Contracting Act (CICA), Cigna's timely protest to GAO of contract awards to Noridian Administrative Services, LLC (Noridian) and Palmetto GBA, LLC (Palmetto) triggered an automatic stay of these awards for 100 days to enable GAO to resolve the protest and provide meaningful relief in the event the protest is sustained. The agency decision challenged here overrode the stay on the ground that continued performance is in the best interests of the United States—immediately enabling the awardees to begin performing the contracts. Such performance is ongoing. This matter comes before the Court on Plaintiff's request for a declaratory judgment invalidating the override and motion for a permanent injunction—both of which would effectively reinstate the stay.

The essence of the override decision is that the stay would delay CMS' scheduled implementation of a newer and better Medicare claims processing system—a massive undertaking—preventing the Government from reaping the cost savings and enhanced performance under the new contracts.[2] The problem with this delay-based justification is that CMS, in a report to Congress in February 2005, asserted that it had "flexibility" in its procurement schedule which could accommodate "any unforseen changes in the marketplace or legislative environment" and still enable CMS to meet the Congressionally-mandated implementation date of 2011 for the new contracts. CMS' asserted need to maintain its "tight schedule" which underlies this override directly contradicts its self-proclaimed schedule flexibility in its report to Congress.[3]

CMS' override also failed to consider several relevant factors. CMS summarily concluded, without explanation or backup, that "the potential harm to Medicare program in delaying implementation of the Durable Medical Equipment Medicare Administrative Contractors (DME MAC) contracts outweighs the risk that GAO will require corrective action as a result of the Cigna protest." The override decision did not articulate the risks to the Medicare contracts in the event GAO should sustain the protest. The decision did not mention the costs associated with undoing the transition work if GAO orders a recompetition—costs of terminating the new contracts and potentially retransitioning different contractors. Nor did the override evidence any consideration of the minimal harms to the agency in the event GAO denies the protest and the stay remains in place. There has been no showing that a 70–day hold on the procurements will have any adverse impact on the receipt of Medicare claims processing services during the stay. This work will continue to be performed under the incumbent contracts which are in effect until September 2006 and are renewable.

CMS' override decision determined that proceeding with the awards until GAO decides the protest would not take work away from Cigna. However, potential loss of work is not the only harm to Cigna here—the

---

2. CMS determined that a stay would prevent completion of the "cutover" of all contract activities to the awardees by its scheduled date of July 1, 2006. This delay in turn would, in CMS' view, increase costs by continuing the more expensive former contracts for a longer time, preventing simultaneous cutovers of all contracts in the four jurisdictions, causing "unnecessary disruption, higher costs, and potential erroneous payment of claims."

3. The Government and Intervenors argue that CMS' statement about flexibility in its schedule was directed to later phases of the Medicare contracting implementation, not the start-up phase which involves the procurement at issue. GAO had criticized the later phases as being too accelerated since CMS' schedule contemplated full implementation by 2009—two years earlier than the Congressionally-mandated 2011. CMS' statement about its schedule however was not confined to any particular phase, and there is no evidence suggesting why some 70 days—less than 10 percent of the two-year leeway in CMS' schedule—could not be utilized now to accommodate the CICA automatic stay.

override ignores the competitive advantage that awardees could gain in the event of a recompetition by performing the new contract now. Cigna's proposal had received [                    ] in both Jurisdictions C and D, and one technical evaluation factor for award in the Solicitation, the most important, "capability," assesses an offeror's "understanding of requirements." Clearly, there is a risk that a contractor would gain an "understanding of requirements" by performing them. In addition, the transition from Cigna to Noridian in Jurisdiction D involves a transfer of Cigna's processes and methodologies to Noridian now, which, in the absence of a stay, poses a risk of an unfair competitive advantage to Noridian should GAO order a recompetition.[4]

Nor did the override decision consider the statutory mandates for competition in both CICA and the MMA and the adverse impact on competition that the override could effect. It is ironic that CMS, in overriding the stay, is undermining a key component of the competitive procurement process it is supposed to be furthering under the MMA, by taking some of the teeth out of the GAO protest process.[5] Finally, the record does not support a determination in the override that there would be some $5 million in savings realized by going forward with the contracts.

4. The Government apparently now recognizes this and *sua sponte* retreated from its override by directing Noridian employees *not* to go onsite at Cigna as they had planned until GAO resolves Cigna's protest. Declaration of Rodney L. Benson dated Mar. 1, 2006, Attachment. However, this new *post hoc* instruction, which is tantamount to an amendment to the override, while mitigating a major risk, does not eliminate all risk to Cigna associated with Noridian's ongoing performance.

5. Government counsel likened the "teeth" Cigna is trying to import to the process here to gigantic shark teeth but that analogy, however humorous, misses the point. Absent the stay, GAO's protest process—an enforcement mechanism for competition in government procurement—can be rendered illusory or "toothless" if agencies cavalierly invoke best interest overrides and "extremely tight" schedules just to get on with their procurements.

6. The findings of fact are based upon the administrative record (AR) and the statement of work (SOW) in the solicitation, Plaintiff's Exhibit 1 in

Because the override decision contradicts evidence of record regarding the impact of delay, fails to consider relevant factors or to explain its conclusion and is not supported by the AR, the Court declares the override decision invalid and sets it aside, thereby reinstating the stay in Cigna's GAO protest.

## Findings of Fact [6]

Cigna is a Part B Medicare Carrier for Idaho, North Carolina and Tennessee, and the incumbent DME Regional Contractor (DMERC) for CMS Region D.[7] Cigna has served as the incumbent Jurisdiction D DMERC contractor for the past 13 years. Cigna and the other three DMERCs currently process DMEPOS claims for the Medicare program and will continue to do so until the transition under the challenged procurement is completed.

Noridian, the contract awardee for the Jurisdiction D DME MAC contract, is headquartered in Fargo, North Dakota, is not an incumbent DMERC, and has not processed DMEPOS claims previously. Palmetto, the contract awardee for the Jurisdiction C DME MAC contract, is headquartered in Columbia, South Carolina and currently serves as the DMERC for the majority of the states in Jurisdiction C except for Virginia and West Virginia, which AdminaStar Federal, Inc., another DMERC, currently services.[8]

Support of Motion for Temporary Restraining Order (Pl.'s TRO Ex. 1), and the other portions of the Solicitation requested by the Court, Sections L and M.

7. A Part B Carrier processes claims for Medicare Part B including claims for physicians, laboratories and other services. AR, Tab 2. Region D is one of the four current DMERC regions and includes Alaska, American Samoa, Arizona, California, Guam, Hawaii, Idaho, Iowa, Kansas, Missouri, Montana, Nebraska, Nevada, North Dakota, Northern Mariana Island, Oregon, South Dakota, Utah, Washington and Wyoming. Region D aligns exactly with what will be Jurisdiction D for the new DME MACs. AR, Tab 6.

8. On January 6, 2006, the DME MAC contracts for Jurisdictions A and B were awarded to National Heritage Insurance Company (NHIC) and AdminaStar Federal, Inc. (AdminaStar), respectively. Pl.'s TRO Ex. 2. No protest has been filed against the awards in those jurisdictions.

The Medicare Program provides health insurance to (1) eligible individuals aged 65 and over; (2) certain individuals eligible for disability benefits under the Social Security System and their dependents; and (3) individuals with acute kidney failure. SOW at 11; Pl.'s TRO Ex. 1. Medicare covered approximately 43 million people in FY 2003. *Id.* The majority of Medicare beneficiaries access their insurance benefits in the traditional Medicare fee-for-service (FFS) program, under which CMS provides the benefits through an indemnity insurance model. *Id.* Supplementary Medical Insurance (SMI), generally known as Medicare Part B, one of two parts of the FFS program, provides coverage for the services of physicians, certain other licensed practitioners, and other services and items, including durable medical equipment (DME). SOW at 12; Pl.'s TRO Ex. 1. Hospital Insurance, providing coverage for Medicare institutional benefits and hospitals, is the other part of the FFS program and is commonly known as Medicare Part A. *Id.* Since the inception of Medicare, CMS has contracted out claims processing, provider and beneficiary services, and appeals to a set of contractors known as Medicare Fiscal Intermediaries (FIs) and Carriers. The Carriers process claims and handle benefit payment functions for professional providers and suppliers under Part B of the Medicare program. SOW at 14; Pl.'s TRO Ex. 1.

In 1992, CMS entered into contracts with four DMERCs, one of which was Cigna, to process claims for DMEPOS under Part B of the Medicare program. SOW at 12; Pl.'s TRO Ex. 1. The full and open competition requirements in the FAR did not apply to CMS' 1992 DMERC contract awards. In FY 2004, the four DMERCs processed over 68 million claims from DMEPOS suppliers involving Medicare program benefit payouts in excess of $9.1 billion. *See* Pl.'s. Mem. of Law in Support of Mot. for TRO at 7.

The MMA mandates that CMS use competitive procedures to replace CMS' current use of FIs and Carriers with a uniform type of Administrative entity referenced as "Medicare Administrative Contractors" or "MACs" by late 2011. *See* 42 U.S.C. § 1395kk-1(b)(1)(A) (2005) ("[T]he Secretary shall use competitive procedures when entering its contracts with [MACs] ... *taking into account* performance quality as well as price and other factors."). MACs will serve as providers' primary point of contact for the receipt processing and payment of claims. AR, Tab 2 at 91. The MMA directed CMS to submit a Report to Congress and the Comptroller General describing CMS' plan for implementation of the statutory amendments by October 1, 2004. *See* 42 U.S.C. § 1395 kk–1 at Notes. The MMA also required the Comptroller General to conduct an evaluation of such plan and to submit to Congress, not later than six months after the date the CMS report is received, a report on the evaluation and to include in that report such recommendations as the Comptroller General deems appropriate. *Id.*

### *CMS' Report to Congress*

On February 7, 2005, some four months late, CMS provided Congress and GAO with the required Report, entitled "Medicare Contracting Reform A Blueprint for a Better Medicare," detailing the steps HHS intended to take to implement the new MAC authority. HHS addressed the schedule as follows:

### MAC Acquisition and Transition Schedule

CMS plans to compete the existing FI, carrier, RHHI, and DMERC workloads beginning with a start-up acquisition and transition cycle focused on a small discrete workload followed by 2 MAC acquisition and transition cycles.... CMS anticipates each acquisition cycle—from solicitation to award—will take approximately 9 to 12 months, and estimates the subsequent transition of workload from existing contractors to new MACs will range from 6 to 13 months after a MAC award. The full FFS contracting workload will be transitioned to MACs by October 2009.

The start-up cycle will compete the current DMERC workloads and one Primary A/B MAC. The comparatively small and stable nature of these workloads will allow CMS to examine its acquisition and transition efforts, and apply lessons learned to future cycles as well as train new personnel on specific activities.

Cycles One and Two will compete and transition the balance of the FFS workload. These cycles will subject greater than 40 percent of the national workload to competition and transition at a single time. In addition, the cycles will require substantial risk management and schedule precision to minimize possible operational disruption. Table III–1 provides a percentage breakdown of the total Medicare workload transitioned by MAC cycle.

Table III-1: Percentage of Medicare Workloads Transitioned to MACs

|  | Start-Up Cycle | Cycle One | Cycle Two |
|---|---|---|---|
| % of National Workload |  |  |  |
| Transitioned | 8.8% | 44% | 47.2% |
| Cumulative % | 8.8% | 52.8% | 100% |

This schedule allows greater savings to accrue to the Medicare program faster by moving large amounts of the FFS workload in a short period of time. CMS believes the initial start-up cycle with the subsequent rapidly phased implementation approach:

- Balances the urgency of achieving operational and programmatic savings with the need to manage the operational risk of disrupted service to beneficiaries and providers, and

- Maximizes efficiency in managing the MACs

This schedule also provides flexibility within the mandated implementation timeframe (2005–2011) to allow CMS to monitor each procurement. CMS may adjust the planned schedule as needed in order to ensure continuity in claims payment and processing.

AR, Tab 2 at 93–94. The effort to award the four DME MAC contracts as well as the first jurisdiction of 15 in which Medicare Part A and Part B services will be combined is referred to as the "Start-up cycle." AR, Tab 1 at 64. The "Start-up cycle" accounts for only nine percent of the national claims processing workload. Id. at 20–21. CMS has scheduled cutover for the four DME MACs in Jurisdictions A, B, C and D to take place by July 1, 2006. Id. at 64.

CMS plans to convert the remaining 91 percent of the claims-processing workload in two cycles—"Cycle one" and "Cycle two."

Id. at 22. Cycle one will result in the award of A/B MAC contracts in seven jurisdictions, and CMS' schedule anticipates the solicitations to be issued by September 2006, with cutover by September 2008. Id. at 64. Cycle two will result in the award of A/B MAC contracts for the remaining seven jurisdictions with the solicitations to be issued by September 2007 and cutover contemplated by July 2009. Id.

## GAO's Report

GAO performed an investigation of the contracting reform plan in CMS' Report to Congress and timely issued its Report entitled "Medicare Contracting Reform: CMS' Plan Has Gaps and Its Anticipated Savings are Uncertain." AR, Tab 1 at 4. The GAO Report summarily assessed CMS' plan as follows:

CMS' plan provides an appropriate framework to implement contracting reform in some critical areas but not in others. For example, the plan indicates the rationale for reform but lacks a detailed schedule to coordinate reform activities with other major initiatives CMS intends to implement at the MACs during the same period. Further, CMS' plan does not comprehensively detail steps to address potential risks during the transitions of the claims workload from the current contractors, such as failing to pay providers or paying them improperly. These transitions will be complex to manage because they require moving multiple claims workloads from current contractors to a single MAC with new jurisdictional lines.

AR, Tab 1 at 4.

GAO commented on the Start-up cycle as follows:

While the start-up cycle transitions are complex, they are planned to affect only 1 A/B MAC and the 4 DME MACs. CMS will be conducting a much greater number of transitions for cycles one and two, as the rest of the claims administration work is transferred from current contractors to 14 A/B MACs and 4 HH MACs [Home

Health and Hospice Medicare Administrative Contractors].

AR, Tab 1 at 23.

The GAO report noted that CMS' implementation of the plan by 2009 was two years ahead of the MMA's timeframe, and that CMS' ambitious scheduling plan did not sufficiently address the risks associated with such an accelerated schedule. AR, Tab 1 at 20–22. GAO, focusing on Cycles one and two, which are to begin after the current "start-up" cycle, noted that CMS' schedule "left little time for" certain acquisition efforts, including the resolution of protests:

> CMS's accelerated schedule for cycles one and two leaves little time for CMS to examine its acquisition and transition efforts, apply lessons learned, and resolve disagreements about the agency's award process with companies that were not selected.

*Id.* at 21–22.

GAO further addressed CMS' accelerated implementation of the reform initiative as follows:

- "Basing an accelerated implementation schedule on uncertain savings raises concerns that CMS has unnecessarily created additional challenges to effectively managing the risk of these transitions." AR, Tab 1 at 4; *see also* AR, Tab 1 at 10.

- "Furthermore, CMS is proposing to transfer all work to MACs by July 2009, which is more than 2 years ahead of the MMA's specified time frame. If these transitions go awry, physicians and other providers could experience payment delays and errors." AR, Tab 1 at 10.

GAO further stated that "[i]mplementation of contracting reform is an inherently high-risk activity because it will involve complex transitions of claims workloads from current contractors to MACs." AR, Tab 1 at 10. GAO recommended that CMS "extend its implementation schedule from 2009 to 2011, to be better prepared to manage contracting reform." *Id.* at 4.

### CMS' Response to GAO

On July 29, 2005, CMS replied to GAO's draft report. AR, Tab 1 at 53–63. With respect to GAO's comments on the accelerated implementation schedule, CMS stated:

> While CMS acknowledges some of the points raised in this report, we do not concur with the GAO's recommendation. . . .

> By achieving full MAC implementation in 2009, CMS will realize the benefits, both in terms of Trust Fund Savings and operational efficiencies, more quickly than if the schedule were extended. The continuing development of modernized Information Technology (IT) systems will improve overall processing of claims, and implementing consolidated data centers will provide the necessary infrastructure to improve data collection and analysis while reducing costs.

> CMS believes that extending the transition schedule past 2009 will increase the risk of current fiscal intermediaries (FIs) and carriers leaving the program before competitions are finalized . . . .

> *The schedule published in the 2005 report to Congress, . . . with a 2009 completion date, provides CMS flexibility to adjust in response to any unforeseen changes in the marketplace or legislative environment and still meet the statutory implementation date.* CMS would not have this flexibility should it extend its baseline plan to finish implementations on or near October 1, 2011.

AR, Tab 1 at 55 (emphasis added).

In its report, GAO had also noted that CMS' estimates of costs and savings were "too uncertain to support decisions on contracting reform implementation." AR, Tab 1 at 4. CMS responded by stating that the "estimated savings were intended to be somewhat conservative (low) because of the uncertainty involved" and that the expected savings were "well informed by program experience and the best available." AR, Tab 1 at 61–62.

### The Solicitation

On April 15, 2005, CMS issued the DME MAC Solicitation on a full-and-open competition basis. The DME MAC procurement was the first procurement by CMS applying the FAR competition and other require-

ments. Pl.'s TRO Ex. 2. The Solicitation generally sought proposals for DME MACs to replace the DMERCs and to provide specified FFS health insurance benefit administrative services, including Medicare claims processing and payment services, for DME-POS in each of the four DME jurisdictions. SOW at 13; Pl.'s TRO Ex. 1.

The Solicitation contemplated the award of four cost-plus-award fee contracts with a one-year base period consisting of a six-month transition period, a six-month fully operational period and four one-year option periods. Solicitation § F.2.; Pl.'s. TRO Ex 6. Each contract covered one of the four DME jurisdictions. Id. at § L.12. The Solicitation did not limit the number of awards or the amount of FFS workload any one entity could receive. Id. at § L.22.

The SOW required the DME MAC to receive and control Medicare claims (both electronic and paper) from DMEPOS suppliers and beneficiaries within its jurisdiction, as well as to determine whether the claims are complete and should be paid. Pl.'s TRO Ex. 1, at 14, 62–78. The SOW also required the contractor to calculate Medicare payment amounts and remit the payments to the appropriate party. Id. The contractor was required to develop relationships with the DMEPOS suppliers and provide a variety of supplier services, e.g., answering written inquires and educating the suppliers on Medicare rules, regulations, and billing procedures. Id. at 13–14. Finally, the Solicitation required the contractor to conduct re-determinations on appeals of claims and respond to complex beneficiary inquires referred from the Beneficiary Contact Centers. Id. at 14, 78–88, 88–104.

Section L of the Solicitation set out the instructions for the technical proposal as follows:

> The offeror shall provide a clear and concise description of its understanding of the requirements of the tasks provided in the statement of work. The offeror shall provide a description of their [sic] operational methodology to accomplish each of the requirements in the statement of work.

Solicitation § L. 15. The proposals were to be judged on a series of factors with "all evaluation factors other than cost/price when combined" being "significantly more important than cost/price." Id. § M.2. The Solicitation stated that "the Government is more concerned with obtaining superior technical/management features than with making an award on the lowest overall cost to the Government." Id. An offeror's capability was most important to the procurement. Id. § M.4. Within capability the offeror's understanding of the requirements was the most important factor, with project management second in weight. Id. When judging a proposal's project management section, "[t]he offeror's overall approach for managing the ongoing operations of the DME MAC contract" would be evaluated. Id. In terms of the Project Management Plan, the offeror would be evaluated on:

> the degree to which its project management plan and work breakdown structure demonstrate[d] its ability to accomplish the requirements. The offeror [would] also be evaluated on its knowledge of the difficulties, uncertainties, and risk associated with successful ongoing operations, and the degree to which the offeror has identified any potential risks to ongoing operations and its strategies to respond to risks.

Id. The Solicitation provided for award by jurisdiction to the offeror whose proposal offered the best overall value to the Government. Solicitation § M.2.a.

### The Awards

On January 6, 2006, CMS awarded the DME MAC contract for Jurisdiction C to Palmetto and the contract for Jurisdiction D to Noridian. Pl.'s. TRO Ex. 2 at 1, 4. CMS notified Cigna of these award determinations the same day by telephone. On January 9, 2006, Cigna timely requested a postaward debriefing, which CMS held on January 20, 2006. Cigna filed a protest with GAO on January 24, 2006, within five days of the debriefing.

### Cigna's Protest

The primary grounds for Cigna's protest with respect to the Jurisdiction D award to Noridian are that CMS:

a. misevaluated the offerors' cost proposals by failing to perform the FAR-required cost realism analysis, failing to follow the Solicitation's evaluation scheme for reviewing offerors' historical costs and budget history, and failing to complete the cost evaluation before making the award determination;

b. failed to conduct the FAR-required professional compensation analysis for the Jurisdiction D proposals;

c. misevaluated Cigna and Noridian's technical proposals, making factually erroneous conclusions and ignoring Cigna's revised proposal submissions;

d. failed to conduct meaningful discussions with Cigna; and

e. deviated from the Solicitation's best value evaluation scheme and improperly awarded the contract to the low cost, technically acceptable offeror.

Pl.'s TRO Ex. 9.

The primary grounds for Cigna's protest with respect to the Jurisdiction C award to Palmetto are that CMS:

a. misevaluated the offerors' cost proposals by failing to perform the FAR-required cost realism analysis, failing to consider the evaluation criteria set forth in the Solicitation, and failing to complete the cost evaluation before making the award determination;

b. failed to conduct the [        ];

c. misevaluated Cigna and Palmetto's technical proposals;

d. failed to conduct meaningful discussions with Cigna;

e. [        ]; and

f. deviated from the Solicitation's best value evaluation scheme and [        ].

Pl.'s TRO Ex. 9.

As relief in its GAO protest, Cigna seeks termination of Noridian's and Palmetto's contracts and a directed award to it. Alternatively, Cigna ask GAO to "direct CMS to reopen the procurement, re-evaluate the proposals, and award the contracts in a manner consistent with the solicitation." Pl.'s TRO Ex. 9 at 90.

Because Cigna timely filed its protest pursuant to CICA's protest and stay provisions and GAO timely provided CMS with notice of the protest, CMS stayed performance of the protested contracts pending GAO's resolution of the protest, in accordance with CICA. 31 U.S.C. § 3553(d)(3) (2005); 48 C.F.R. § 33.104(c)(1) (2005). GAO is to decide the protest within one hundred days from the date Cigna filed the protest, *i.e.*, on or before May 4, 2006. 31 U.S.C. § 3554(a)(1) (2005); 4 C.F.R. § 21.9(a) (2005).

### The Override

On February 10, 2006, CMS issued an override of the CICA stay and directed Noridian and Palmetto to commence performance of the challenged contracts. CMS concluded that GAO is to issue its decision on Cigna's protest by May 4, 2006 and that continued performance of activities for both Jurisdiction C and D contracts until that time would be in the best interests of the Government.

In concluding that the override was in the best interests of the United States, the override decision listed a number of determinations:

- Proceeding with the transfer implementation activities will thus not take work away from the current contractors until the time of the cutover. In this instance the cutover is planned for July 1, 2006;

- Delaying transfer-implementation activities until after May 4 ... would make timely completion of this cutover impossible ... The result would be increased costs of benefit administration under the old contracts for this workload, increased costs because of non-simultaneous cutovers in the four DME MAC jurisdictions, and poorer service for the program and its beneficiaries for an extended period. In addition, the delay in this implementation would result in a backup of administrative capacity of the agency, resulting in delays in further workload transfers for the claims under Parts A and B of the Medicare Program, with further (and larger) forgone savings and failure to achieve anticipated improvements in service on a timely basis.

- The Secretary presented his plan for this implementation in a Report to Congress dated February 25, 2005. This report outlines a stepwise plan under which the four [DMERC] contracts are to be re-competed first.... The scheduling of this staged approach is extremely tight, and the need to simultaneously maintain existing operations in some areas while new contracts are being implemented in other will strain the administrative capacity of the agency. The Report to Congress and subsequent President's Budgets convey the Secretary's estimates of significant savings over time from full implementation of the Medicare Administrative Contracts. Failure to proceed with the implementation of the DME MAC contracts by July 1, 2006 will result in forgone savings of more than $5 million for these contracts in fiscal year 2006, and the Secretary will not be able to meet the deadline commitments and savings expectations he has conveyed to Congress.

- The implementation of the new DME MAC contract will result in enhancements to the services provided to Medicare beneficiaries through improved contractor performance and more effective management of Medicare data and information providing the Government with the ability to better manage the billions of dollars in DME program expenditures estimated in [FY] 2006 .... The new DME MAC contracts include explicit performance expectations for the contractors to improve the assurance that the right claims are paid timely and correctly.... Delays in implementation ... are likely to result in higher payment errors that create an unnecessary and unacceptable risk of financial harm to the Medicare trust funds.

- Many of the implementation activities for the four DME MAC jurisdictions are interrelated .... In particular, failure to proceed with implementation in Jurisdiction C at the same time as Jurisdictions A and B will cause unnecessary disruption and higher administrative costs to provide alternative ways for these func-tions to proceed in those two jurisdictions.

- For FY 2006, CMS has a serious budget shortfall due largely to the challenges of implementing the new outpatient prescription drug program under Part D of the Social Security Act within its appropriated administrative budget. CMS has anticipated approximately $5 million in savings, this fiscal year, resulting directly from implementing the DME MAC contracts and related options in the time-frame specified in the Report to Congress. If CMS is unable to implement these contracts on July 1, 2006, the agency will not achieve the anticipated savings, and other significant administrative activities will be deprived of funds.

- A delay in the current cutover date of July 2006 for the DME MACs adds significant risk to the next contract award and implementations under the Medicare contracting reform legislative authority .... The next MAC contract is scheduled for award in June 2006 and implementation activities must commence immediately to prevent further disruptions in the schedule.

Override Decision, Pl.'s TRO Ex. 10.

### Transition Activities

Prior to May 4, 2006, when GAO will make its decision on Plaintiff's protest, numerous transition activities are scheduled to occur. Noridian's implementation plan at the time of the override contained of over 1800 individual tasks, 80% of which were scheduled to begin and 60% of which were scheduled to be completed prior to May 4, 2006. These activities include:

- Assess/Monitor/Document CIGNA Processes for Customer Service, AR, Tab 8, Ln. 469;

- Monitor Cigna's Workload Levels, *Id.,* Ln. 211;

- Analyze Cigna's Direct Data Entry Systems, *Id.,* Ln. 926–27;

- Assess Cigna's Current Processes and Workflows for Electronic Data, *Id.,* Ln 961–62;

- Assess Cigna's Processes for Standard System Claims Processing, *Id.,* Ln. 1037–38;

- Assess Cigna's Processes for Recoupment, *Id.,* Ln. 1225–26;

- Assess Cigna's Processes for Debt Referral, *Id.,* Ln. 1266–67;

- Develop Procedures for Meeting Performance Requirements, *Id.,* Ln. 482;

- Develop Error Rate Reduction Plan, *Id.,* Ln. 590;

- Develop Data Analysis Program, *Id.,* Ln. 603–06;

- Filling Management Positions, *Id.,* Ln. 723, 738;

- Purchasing Computer Hardware, *Id.,* Ln.2045–59.

AR, Tab 6.

Similarly, Palmetto has a number of transition activities scheduled prior to May 4, 2006 in furtherance of the transition of Palmetto from a DMERC to a DME MAC, as well as transitions for the option contracts for MED-IS (the nation-wide front-end electronic claims system), the national Data Center, the National Supplier Clearinghouse (NSC), and the Data Analysis Contractor (DAC). Palmetto plans to inform providers who electronically file their claims of their ability to enroll in MEDIS early in the transition.

### Procedural History

Four days after the override decision was issued, on February 14, 2006, Cigna filed the instant action and its Motion for Temporary Restraining Order and Preliminary Injunction. The Court held a status conference that afternoon and granted motions to intervene on behalf of Noridian and Palmetto.

An evidentiary hearing on the Motion for Temporary Restraining Order (TRO) was held on February 16, 2006, and the Court orally denied Plaintiff's motion for a TRO finding that Cigna had not proven that it would suffer irreparable harm in the ensuing 10 days. On February 17, 2006, Defendant filed the AR consisting of twenty-five documents totaling 433 pages.[9] On February 21, 2006, Defendant filed a supplement to the AR, containing two documents.[10] On February 27–28, 2006, the court held an evidentiary hearing on Plaintiff's motion for permanent injunctive relief, limiting evidence to the factors for injunctive relief and heard argument on the pending motions.

### Discussion
### Jurisdiction and Standard of Review

The Court has jurisdiction to review an agency's best interests override of a CICA stay. 28 U.S.C. § 1491(b)(1); *see also RAMCOR Servs. Group v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999); *Spherix, Inc. v. United States,* 62 Fed.Cl. 497, 503 (2004); *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 660 (2003); *University Research Co., LLC v. United States,* 65 Fed.Cl. 500 (2005). In reviewing an agency's override, the Court reviews the defendant's action under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4); *see also Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005). The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In order to prevail, the protestor must show by a preponderance of the

---

**9.** The Court granted Defendant leave to withdraw a document inadvertently included. AR, Tab 7, Tr. (Feb. 27, 2006) at 32.

**10.** The documents in the AR include: the GAO Report; CMS' Report to Congress; an undated DME MAC v. DMERC Comparison; Section B of the Noridian and Palmetto Contracts; DME Statistics from 2004; Transition documents such as deliverables needed for transition; Implementation Plans; CMS' Operating Plan Glossary; Budget documents including the Budget Requests to Congress for Medicare Operations in FY 2006 and 2007; Internal CMS analysis of the Medicare Contractor Transition and Termination

Costs in general, not relating to the override; Projected Contracting Reform Cost/Savings as of July 2005; Program Management Appropriation Language; E-mails from a CMS employee attaching tables and charts showing the Reform Cost/Savings *inter alia;* and CMS manuals entitled "Durable Medical Equipment Regional Carrier Workload Closeout Handbook" and "Durable Medical Equipment Medicare Administrative Contractor Workload Implementation Handbook." There being no objection, the Court accepted the declaration of Karen Jackson, dated February 26, 2006, listing the documents in the AR.

evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law. *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 648 (Fed.Cl. 2003) (quoting *Info., Tech. and Applications Corp. v. United States,* 51 Fed.Cl. 340 (2001)), *aff'd,* 316 F.3d 1312 (Fed.Cir.2003) (*ITAC*) (internal citation omitted).

The Supreme Court has identified four circumstances which constitute arbitrary and capricious agency action: if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also PGBA,* 57 Fed.Cl. at 659 (An agency's action will be deemed arbitrary and capricious if the agency considered factors which were irrelevant or ignored factors which were relevant to the determination.). Under an arbitrary and capricious review, the Court must not "substitute its judgment for that of the agency." *Id.*

### CICA's Automatic Stay and Override Provisions

CICA automatically stays contract performance when an agency timely receives notice of a GAO protest. Specifically, 31 U.S.C. § 3553(d)(3)(A)(iii) requires the agency to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under the contract." The statute further provides that performance may not be resumed while the protest is pending. 31 U.S.C. § 3553(d)(3)(B).

CICA provides for an override of the automatic stay only where the head of the contracting agency determines that "(i) performance of the contract is in the best interests of the United States; or (ii) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(c). In the event of an override on "best interests" grounds, CICA specifies that if the protest is subsequently sustained, the GAO is to recommend a remedy "without regard to any cost or disruption from terminating, recompeting or reawarding the contract." 31 U.S.C. § 3554(b)(2).

### CMS' Override Decision Contradicted its Own Assertions About the Schedule, Failed to Consider Relevant Factors, and Was Based Upon An Inaccurate Estimate of Cost Savings

On February 10, 2006, seventeen days after Cigna filed its protest and sixteen days after the stay issued, CMS issued an override decision at GAO, determining that continued performance of the implementation activities of the challenged DME MAC contracts would be in the best interests of the United States. The agency's rationale for overriding the statutory stay in this complex, costly procurement for Medicare claims processing was contained in a three and one-half page memorandum with little explanation and generalized conclusions. The override decision was not signed by the head of the contracting activity (HCA) as required by regulation.[11] CMS essentially bases its override determination on the following:

---

11. The override determination was signed by the Director of the Medicare Contract Group for the HCA because the HCA was at a doctor's appointment. The failure of the HCA to sign the decision calls into question the efficacy of the override. FAR 33.104(c) provides that the Head of the Contracting Activity may *on a nondelegable basis* override the stay. The agency's counterpart to this FAR provision contains its own requirement that the Head of the Contracting Activity may not delegate the override authority. HHSAR 333.104(c) (in order to continue performance in the face of a stay, a finding shall be prepared by the Contracting Officer, executed by the HCA (*not delegable*)). *See* Restatement 2d of Agency § 17 (*What Acts Are Delegable.* Comment c. "The attempted exercise by an agent of a power in the performance of a non-delegable act does not operate as the performance of the act."). While this procedural infirmity may be an independent ground for invalidating the override, the error is readily correctable here as the HCA testified that he, in fact, made the override determination. Benson Decl. dated Feb. 26, 2006.

- CMS' plan for Medicare Contracting Reform involves an "extremely tight" schedule and any delays to that schedule will strain the administrative capacity of CMS and add significant risks to CMS' implementation plan;

- the new DME MAC contracts will result in enhancements to the services provided through improved contractor performance and more effective management of Medicare data and information, and the cost savings from the new contracts will be delayed by a stay;

- failure to proceed with the implementation of the DME MAC contracts will result in foregone savings of more than $5 million;

- proceeding with the implementation activities will not adversely affect Cigna because it will continue to provide services during the protest.

- the potential harm to the Medicare program in delaying implementation of the DME MAC contracts outweighs the risk that GAO will require corrective action as a result of the Cigna protest.

***CMS' Assertion That Delay Will Compromise Its "Extremely Tight" Schedule Is Inconsistent With Its Representation to Congress That Its Schedule Is Flexible***

CMS' override is largely premised on the costs and risks associated with delay to its schedule. However, CMS' claim of its "extremely tight" schedule directly contradicts CMS' statement to Congress that its accelerated 2009 schedule—the very same overall schedule CMS claims it must meet here— had built-in flexibility of two years. CMS represented to Congress that: "The schedule published in the 2005 report to Congress . . . with a 2009 completion date, provides CMS the flexibility to adjust in response to any unforeseen changes in the marketplace or legislative environment and still meet the statutory implementation date." AR, Tab 1 at 55.

Although GAO's caution that CMS not rush was directed at later phases of the procurement than the start-up phase at issue here, both CMS' own words to Congress and the schedule itself demonstrate that its claim that an "extremely tight" schedule leaves no room for delay in this procurement is totally unfounded. It is apparent that a 70–day delay in transition activities will not prevent CMS from meeting its statutory deadline, given the two years of slippage CMS has built into its schedule.

It is unreasonable for CMS to represent to Congress that its schedule permits "flexibility" to adjust to unforeseen changes of its choosing—changes in the marketplace or legislative environment—but then to eschew any notion of flexibility and insist upon an "extremely tight schedule" to dislodge CICA's automatic stay. Because the schedule clearly has two years of flexibility, CMS' refusal to avail itself of that flexibility to abide by a 70–day statutory stay is arbitrary and capricious.[12]

***The Override Decision Did Not Articulate Or Evaluate the Risks to the Agency or the Bidders If GAO Sustains Cigna's Protest***

Neither CMS' written finding nor its administrative record contains any assessment of the potential risks to the agency if GAO were to grant Cigna's protest and direct a recompetition, as Cigna is urging. CMS did not evaluate the ramifications of Cigna prevailing on its protest at all—even in the most cursory fashion. Nor did CMS attempt to quantify the costs of recompeting these contracts and redoing the activities it is now conducting with potentially different vendors in the event a GAO-ordered reevaluation were to change the results.

CMS' Override Determination and alleged costs savings analysis reflect no consideration of the termination and transition costs involved if the contract awardees continue performance but GAO sustains Cigna's protest. CMS summarily "determined that the potential harm to Medicare program (sic) in delaying implementation of the DME MAC

---

12. In addition, CMS' own actions here belie its claims of the urgency suggested in the override. CMS submitted its Report to Congress, a precursor to its commencing these MMA procurements, over four months late. AR, Tab 1 at 2. CMS also waited for seventeen days after Cigna filed its protest to issue its override decision, abiding by the stay for over two weeks.

contracts outweighs the risk that GAO will require corrective action as a result of the Cigna protest." Override Decision. This is the type of "naked" assertion that, standing alone, will not support an agency's override decision. *See PGBA, LLC,* 57 Fed Cl. at 660–61.

Because the DMERC and DME MAC contracts are cost reimbursement contracts, CMS ultimately may pay for Cigna to transition out and Noridian to transition in, only then to have to pay for Noridian to transition out and a different awardee to transition in, if Cigna successfully challenges the Jurisdiction D award. Such costs include lease termination, costs of transferring Medicare records and updating records, equipment depreciation, severance pay, and start-up bonuses. Override Decision ¶ 8; AR, Tabs 8, 9 and 10. Likewise, there is a risk that CMS ultimately may pay Palmetto to transition in under the new contract only to have to pay Palmetto to transition out of the new contract and a different awardee to transition in should Cigna prevail in a GAO-directed reopening of the competition.

CMS also failed to consider potential confusion for DMEPOS beneficiaries, suppliers, and other Medicare contractors who will have to coordinate and work with the DMEPOS contractors caused by the switching back and forth between DMEPOS. *See, e.g., Chapman Law Firm Co. v. United States,* 62 Fed.Cl. 464, 468 (2004) (declaring override decision invalid because agency failed to consider confusion and cost involved if contract awardee continued performance and GAO sustained protest).

The statutory mandate of ensuring competition was not adequately considered in the override decision. GAO is currently evaluating the merits of Cigna's protest. Allowing the awardees to continue with performance could skew the playing field if GAO were to order a reopening of the procurement, thus compromising competition. This concern is particularly poignant in the context of this procurement which is premised upon an express Congressional mandate for competition in the Medicare arena. As the Government recognized:

The move away from the FI contracts and carrier contracts to MAC contracts will take us out of the dark ages of Government contracting. An example of the weakness of the current system is the lack of full and open competition.

Def.'s Opp. to Cigna's Request for Injunctive and Declaratory Relief at 9.

The whole point of the CICA stay provision is to ensure that the statutory mandate for competition is enforced. As Judge Allegra noted in *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 657–58 (2003):

In the conference report to the Deficit Reduction Act of 1984, of which CICA was a part, the conferees wrote that, as a part of strengthening the bid protest function at the GAO, "a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced." H.R. Conf. Rep. No. 98–861 at 1435 (1984), U.S.Code Cong. & Admin. News 1984, pp. 697, 1080–81. The automatic stay was viewed as a key element of that mechanism. *See* H.R. Conf. Rep. No. 98–861 at 1435–36, U.S.Code Cong. & Admin. News 1984, pp. 697, 1080–81; H. Rep. No. 98–1157 at 23–25 (1084). As noted by one commentator reviewing this legislative history, "CICA was given teeth in the form of an automatic stay of contract award or automatic suspension of contract performance in the case of post-award protests." Robert M. Hanson, "CICA Without Enforcement: How Procurement Officials and Federal Court Decisions Are Undercutting Enforcement Provisions of the Competition in Contracting Act," 6 Geo. Mason L.Rev. 131, 136 (1997).

The override decision failed to consider whether overriding the stay would serve or undermine the Congressional goal of competition embodied in the MMA that the contract awards purported to serve.

The override decision's conclusion that Cigna will continue performing services implying that Cigna will not be harmed, ignores the realities of the competitive federal procurement arena. Cigna will be harmed if GAO grants its protest and orders a reprocurement because its competitors will be gaining an understanding of the require-

ments of the Solicitation by performing the new, restructured, consolidated work. The challenged awards are contracts which "fundamentally change Medicare claims administration contracting practices." AR, Tab 1 at 9. As such, by performing work under the challenged awards, Noridian and Palmetto will be gaining experience under the "fundamentally changed" system which may provide them with a competitive advantage, in the event of a recompetition—an advantage other bidders, including Cigna, will not have.[13] Doing the work under the Solicitation may enable Noridian and Palmetto to gain insights which could aid them in amending their proposals should GAO order such a remedy. Section M of the Solicitation governing the evaluation, provides that an offeror's capability is the most heavily weighted technical factor, and within "capability" the offeror's "understanding of the requirements," is the most important factor. There is a strong risk that a contractor would enhance its "understanding of requirements" by performing them. The override decision did not consider this risk. Nor did the override decision take into account competitive harm in the event of a reprocurement stemming from the disclosure of Cigna's processes, operations and methodologies to its potential competitor, Noridian, by virtue of Noridian's performance of transition activities. In short, the agency failed to objectively assess harms potentially caused by the override.

### The Prospect Of Newer, Better Contracts Is Not Itself A Sufficient Basis To Override A Stay.

CMS also bases the override decision on its determination that implementation of the new DME MACs will result in enhancements to services and that failure to proceed with CMS' strict timetable for the implementation will delay these advantages and cause increased error rates. However, the mere fact that a new contract provides advantages or efficiencies over the prior contract does not support a best interest override. *See Chapman,* 62 Fed.Cl. at 466 ("Normally the fact

that a new contract is better than an old contract would not constitute a valid basis for an override decision.").

Moreover, the AR does not support CMS' conclusory finding that any delay in implementation may result in higher payment errors or risk of financial harm to the Medicare Trust. In contrast, the GAO Report cites a different cause of potential error—that CMS' accelerated schedule for implementation "significantly increases the risk that providers' claims will be paid improperly or not be paid at all." AR, Tab 1 at 43.

### CMS' Estimate of Cost Savings From Continued Performance During the Stay Is Not Supported By the AR

The override decision asserts that the delay will cost Defendant over $5 million in anticipated savings for FY 2006. However, the untitled document in the AR which Defendant and Intervenors cite as support for the savings shows $5 million in savings for a switch from the DMERC contractors to the DME MAC contractors for the *full* base year, not the savings that will be lost due to a delay of some 70 days. Further, this document reflects $5 million in combined savings for all *four* Jurisdictions and does not separate out the purported savings due to a change from DMERC to DME MAC contractors in Jurisdictions C and D—the only Jurisdictions affected by the override. Here, as in *PGBA,* the agency's reliance on erroneous, overstated assumptions undercuts the agency's conclusion that the Defendant will lose these purported savings due to the stay.

Nor does the Administrative Record support the agency's conclusion that a stay would adversely affect DME MAC Jurisdictions A and B. The override decision states that "an orderly cutover would not be possible on July 1, 2006, necessitating ... increased costs because of non-simultaneous cutovers in the four DME MAC jurisdictions." Override Decision. However, the override decision does not explain what the "increased costs" would be, and the Adminis-

---

13. Cigna's GAO protest claims that meaningful discussions were not held. If GAO sustains this ground of protest, discussions could be reopened warranting submission of revised proposals. If that were to occur, Noridian's and Palmetto's experience performing the new contracts could aid them in revising their proposals.

trative Record does not address the purported increased costs if Jurisdictions A and B were transitioned prior to Jurisdictions C and D.

### Declaratory Relief

Given that the override decision is inconsistent with CMS' own report to Congress, unsupported by the AR and arbitrary and capricious, the Court grant's Plaintiff's request for a declaratory judgment, declaring the override decision invalid, resulting in a reinstatement of the stay. Because the declaratory judgment will reinstate the stay and vacate the override, having the same effect as an injunction, the Court does not reach the issue of injunctive relief. In so ruling, the Court has taken into account the necessity of resolving this matter expeditiously recognizing that each day that passes prolongs the time when the stay is not in effect.

### Conclusion

1. The Court grants Plaintiff's request for a declaratory judgment.

2. The override decision issued by CMS on February 10, 2006, is hereby declared to be arbitrary and capricious and invalid. The override decision is set aside, and the automatic stay in Cigna's GAO protest is reinstated *de jure*.

3. The parties shall file proposed redactions to this Opinion and Order no later than **March 10, 2006**.

4. The Clerk shall enter the above declaratory judgment in a public filing.