330

**PMTECH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 10–458 C.**

United States Court of Federal Claims.

Oct. 20, 2010.[1]

1. This opinion was issued under seal on August 20, 2010. Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. On September 10, 2010, plaintiff filed a joint notice indicating that the parties had no proposed redactions to the opinion. Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

Douglas L. Patin, Washington, DC, for plaintiff. Joel E. Brown, Birmingham, AL, and Steven A. Pozefsky, Washington, DC, of counsel.

Christopher L. Krafchek, Washington, DC, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director, Washington, DC, for defendant. Donald Crockett, Washington, DC, and Mary D. Copeland, Oak Ridge, TN, U.S. Department of Energy, of counsel.

## OPINION

BUSH, Judge.

Now pending before the court are the parties' cross motions for judgment on the administrative record, which have been fully briefed and are ripe for a decision by the court. Although the parties' motions were not captioned as such, the court believes that the motions are most appropriately treated as cross motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). Plaintiff PMTech, Inc. (PMTech) challenges defendant's decision to override an automatic stay of the performance of a task order that is the subject of a pending bid protest before the Government Accountability Office (GAO).

Because PMTech has failed to demonstrate that defendant's decision to override the au-

tomatic stay of performance was arbitrary, capricious, an abuse of discretion or otherwise contrary to law, the court is unable to award the relief plaintiff seeks. Accordingly, PMTech's motion for judgment on the administrative record is hereby denied, and defendant's motion for judgment on the administrative record is granted. Subsequent to oral argument, and after careful consideration, the court orally denied PMTech's motion on August 3, 2010. This opinion articulates that determination.

## BACKGROUND[2]

### I. Factual History

#### A. Procurement History and Protests

The Oak Ridge National Laboratory (ORNL) is located in Oak Ridge, Tennessee and is part of a larger United States Department of Energy (DOE) complex known as the Oak Ridge Reservation (ORR). AR at 410. The ORR was established in the early 1940s as part of the World War II Manhattan Project to support the development of the world's first atomic weapon. *Id.* DOE's activities on the ORR over the past sixty years have resulted in significant radioactive and other hazardous contamination at a number of facilities on the site. *Id.* The ORNL is currently operated and managed by UT–Battelle, LLC (UT–Battelle) under a five-year contract with DOE. Compl. Ex. O.

DOE is the lead agency responsible for the environmental remediation of the entire ORR complex, including the ORNL. AR at 410–11. The environmental cleanup of the ORR is managed under DOE's Environmental Management (EM) program. AR at 411. On November 7, 2003, defendant issued a solicitation for, *inter alia,* the deactivation, demolition and removal of contaminated buildings at various DOE facilities. Compl. ¶ 11. DOE awarded several indefinite-delivery, indefinite-quantity (IDIQ) base contracts for such work under the EM program. AR at 576. Individual projects are awarded as task orders under the base contracts. On Octo-

---

2. The facts recounted here are taken from the administrative record (AR) and PMTech's veri- fied complaint and reply.

ber 7, 2004, both plaintiff and Safety and Ecology Corporation (SEC) were awarded IDIQ base contracts.[3] *See* AR at 566, 576. The base contracts were in effect between October 7, 2004 and April 6, 2010.[4]

On June 15, 2009, defendant issued a solicitation for various environmental remediation services at two buildings located at the ORNL. Compl. ¶¶ 4, 12. Defendant advertised the solicitation as a full and open competition. *Id.* ¶ 2. On July 20, 2009, plaintiff filed the first of three bid protests with the GAO related to the remediation work at issue in this case. AR Tab 21. In that protest, plaintiff argued that defendant was required to limit competition for the task order to small businesses. *See* AR at 579–81. In response, defendant elected to take corrective action and moved to dismiss PMTech's bid protest as academic on August 3, 2009. AR Tab 22.

On October 1, 2009, defendant issued a request for task proposals (RFTP) for the proposed work on Buildings 3026 and 3038 and limited participation in the procurement to small businesses with IDIQ base contracts. AR Tab 1. The task order involves the demolition and disposition of several nuclear radiation containment chambers, known as "hot cells," located within Building 3026 at the ORNL. AR at 9. Under the task order, the contractor is required to decontaminate and demolish the hot cells to grade, remove and dispose of the resulting debris, and decontaminate the remaining slab. AR at 14, 23. The RFTP also calls for the removal and disposal of legacy material from Building 3038, also located at the ORNL, in preparation for its subsequent disposition and demolition. AR at 14–16, 23. Finally, the RFTP includes optional line items for the disposition and demolition of Building 3038 and the removal of legacy material and related work on two other buildings at the ORNL. AR at

17–21. The RFTP indicates that the task order would be funded through the American Recovery and Reinvestment Act of 2009 (ARRA), Pub.L. No. 111–5, 123 Stat. 115, on a cost-plus-award-fee basis. AR at 4–5, 43–48. Under the statement of work, the task order is to be completed no later than September 30, 2011. AR at 22. Defendant received proposals from only two offerors, PMTech and SEC, and subsequently awarded the task order to SEC on March 30, 2010. AR Tab 2. Although plaintiff was the lowest-cost offeror, defendant concluded that SEC had submitted a technically superior proposal that would provide the best value to the government. AR at 214.

Following the submission of task order proposals by plaintiff and SEC, the roof of Building 3026 collapsed, disabling the facility's fire-protection system. Pl.'s Reply Ex. A. In January 2010, Clauss Construction (Clauss), under a subcontract with UT–Battelle, completed the removal of the building's entire wooden superstructure. *Id.* Before removing the superstructure, Clauss sprayed the building's hot cells with a polyurea coating to prevent the spread of contamination on the site. AR at 588. The debris from the demolition project, which was highly contaminated with radiation, was temporarily piled in the charging room area of the building and was subsequently removed from the site. AR at 589. During one particularly heavy storm in January 2010, rainfall overwhelmed the runoff containment system and contamination spread onto the ramp adjacent to Building 3026 leading to a nearby public roadway. AR at 589. Those areas were subsequently decontaminated by pressure washing and scabbling, and the government discovered no evidence that the contamination had spread to the storm drains. *Id.*

Since the removal of the building's superstructure, the hot cells have been exposed to

---

3. The overall contract for environmental remediation work on DOE facilities is formally known as the Department of Energy Office of Environmental Management ID/IQ Nationwide Multiple Award Contract (MAC), and the specific base contracts awarded to plaintiff and SEC, under which the protested task order was issued, fall within contract line item number (CLIN) 002 of the overall MAC.

4. Under their original terms, the base contracts would have expired on October 7, 2009. *See* Compl. Ex. W (amending PMTech's IDIQ base contract to change its expiration date from October 7, 2009 to April 6, 2010). All of the IDIQ base contracts were subsequently extended to April 6, 2010. *See* AR at 556 (noting that "[a]ll the ID/IQ contracts expired on April 6, 2010").

336

the elements, and multiple decontamination efforts have been required with respect to the hot cells and the adjacent charging room area. AR at 591–94. In addition, the polyurea fixative has been damaged by the rain, requiring remediative work by Clauss and InstaCote, the vendor of the sealant. AR at 592, 595.

On April 2, 2010, plaintiff filed a size protest with the Small Business Administration (SBA), in which it argued that SEC exceeded the size limitation set forth in the RFTP. Compl. ¶ 31. One week later, plaintiff filed a second bid protest with the GAO. AR Tab 4. In that protest, plaintiff argued that the substantial adjustments made to SEC's proposed costs reflected a lack of technical understanding on the part of SEC that was not reflected in defendant's evaluation of SEC's technical proposal. AR at 236–39. Defendant once again elected to take corrective action in response to the protest, and the GAO therefore dismissed that protest as academic on May 19, 2010. AR Tab 6.

On April 6, 2010, three days before plaintiff filed its second bid protest with the GAO, the underlying base contracts held by PMTech and SEC expired under their own terms. See AR at 556 (noting that "[a]ll the ID/IQ contracts expired on April 6, 2010"). Because the base contracts have expired, defendant cannot issue any more task orders for environmental remediation work at the ORNL pursuant to those contracts.

On May 20, 2010, the SBA's Office of Government Contracting, Area III, in Atlanta, Georgia (SBA Area Office) issued its size determination, in which it found that SEC met the applicable size requirements established by the RFTP. Compl. ¶ 31. PMTech filed an appeal of that decision with the Office of Hearing and Appeals (OHA) on June 3, 2010.[5] *Id.*

The government reevaluated the proposals submitted by plaintiff and SEC, and affirmed its earlier award of the protested task order to SEC on June 15, 2010. AR Tabs 7–9. Two days later, on June 17, 2010, plaintiff filed its third bid protest with the GAO. AR Tab 10. In its final GAO bid protest, plaintiff argues that award of the task order to SEC was unreasonable because defendant did not address in its corrective action whether the purported technical superiority of the SEC proposal justified its substantial price premium. AR at 307–12. Plaintiff also contends that PMTech and SEC received unequal treatment from defendant during the procurement. AR at 312. Under its regulations, the GAO is required to render a decision on PMTech's pending bid protest no later than September 27, 2010. See 4 C.F.R. § 21.9 (2010) (providing that the GAO must render a decision on a bid protest within 100 days of the date on which it was filed). The filing of the bid protest with the GAO, and the timely notification of defendant of that protest, triggered an automatic stay of performance of the task order pursuant to the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551–3556 (2006).

**B. Override of the CICA Stay**

On July 2, 2010, defendant approved an override of the CICA stay to allow SEC to commence its performance of the remediation work on Buildings 3026 and 3038.[6] AR Tab 18. Plaintiff was notified of the override decision the same day, see *id.*, and was provided a copy of the written determination and findings (D & F) in support of the override on July 7, 2010, see Compl. ¶ 34; AR Tab 19. In the D & F, defendant reaches the conclusion that further delay of the remediation work contemplated under the task order would pose an unacceptable risk to the health and safety of ORNL personnel

5. On July 7, 2010, OHA remanded the challenged size determination to the SBA Area Office for further review. AR Tab 20. Because that remand occurred subsequent to defendant's decision to override the automatic stay of performance, it is not relevant to the court's review of the override decision.

6. As required under CICA, the override decision was approved by the head of the contracting

authority. See 31 U.S.C. § 3553(d)(3)(C). In addition, as required by the Department of Energy Acquisition Regulation (DEAR), 48 C.F.R. § 933.104(c) (2009), the written determination and findings in support of the override decision received the concurrence and approval of the DOE counsel responsible for the override, the senior program officer and the senior procurement executive. See AR at 563.

and the surrounding community. AR at 556. The D & F notes that Building 3026 and Building 3038 have both been designated as "imminent hazard facilities" and contain high levels of radioactive contamination that present serious risks to human health and safety. AR at 557. The D & F makes reference to the thousands of workers at the ORNL who remain in close proximity to the degraded hot cells with large radioactive inventories: "There is an operating Category 2 nuclear facility about 30 meters from Building 3026 and about 50 meters from Building 3038. Approximately 4,500 employees are within a one-mile radius of the buildings on a daily basis, and approximately 4,000 guest researchers, summer students, and other visitors are in this area of ORNL each year." AR at 560 (footnote omitted). While recognizing that UT–Battelle has performed periodic surveillance and temporary remediation measures on the site, the D & F states that those measures have failed to prevent the spread and recurrence of radioactive contamination from the hot cells to other parts of the site. AR at 558.

The document notes that removal of Building 3026's wooden superstructure and the subsequent exposure of its hot cells to the elements has compromised the effectiveness and integrity of the polyurea fixative used to contain the contamination. AR at 559–60. The demolition of the wooden superstructure, according to the D & F, was premised upon defendant's expectation that the hot cells would be removed soon thereafter. AR at 558. The D & F asserts that the government's inability to proceed with the task order, due to multiple challenges of the procurement by plaintiff, has resulted in the release of radiation from the Building 3026 hot cells requiring six separate decontamination efforts on the site between April 2010 and the time of the override decision. AR at 560.

In addition, the D & F indicates that Building 3038 is highly contaminated with radiation as well, and states that physical conditions in that facility have deteriorated substantially since the publication of a report on the building in 2008:

The Facility Manager has confirmed that conditions are worsening since the report was published. Utilities have deteriorated to the point where they are no longer operational. In the last year, the steam system has been valved out due to extensive leaks, causing water damage and the spread of Sr–90 radiological contamination to the "clean" areas (offices, clean labs) of the building. Temporary electric heat has had to be used for freeze protection. Degradation of ductwork in the ventilation system led to a Sr–90 release in the building; as a result, the cell ventilation system has been valved out. Today, a local though temporary ventilation system is being used in some areas of the building, but this system is currently down for motor maintenance.

AR at 559. The D & F further notes that the government incurred environmental remediation costs of more than one million dollars due to a single contamination incident at the ORNL in 2002, and that the costs of a future incident would be much greater due to the significant development that has occurred in the surrounding area in recent years. AR at 560.

The D & F next states that defendant considered the benefits of the stay override, and compared those benefits with its costs. AR at 561–62. The D & F explains that the override will immediately allow SEC to mobilize its assets in preparation for the proposed work on Buildings 3026 and 3038. AR at 561. According to the D & F, the remediation work contemplated by the protested task order is the only permanent and effective means of ensuring that radioactive contamination does not spread beyond its current location. *Id.* With respect to the costs of defendant's decision to override the automatic stay, the D & F notes that the task order cannot be awarded to plaintiff, even if it ultimately succeeds in its bid protest, because its base contract expired before the current bid protest was filed. *Id.* In other words, even if PMTech is ultimately successful in its bid protest, defendant concluded that its remedies would be limited to bid and proposal costs, which would not be affected by the override decision. In light of those considerations, the D & F concludes that the

likely benefits of the override will exceed its costs. AR at 562.

Defendant also determined that there were no reasonable alternatives to an override of the CICA stay in this case. AR at 561. The D & F notes that there is no incumbent contractor qualified to perform the permanent remediation work on an interim basis. *Id.* The D & F further states that it would not be feasible to direct UT–Battelle to commence the work and then later transition that work to another contractor. *Id.* The D & F also asserts that awarding the task order to UT–Battelle, which did not even participate in the task order competition, would undermine competition and the procurement process. *Id.* Finally, the D & F concludes that a new procurement would not be a reasonable alternative because such a procurement could take as long as a year to complete. *Id.*

Finally, defendant determined that an override would not have any adverse impact on competition or the integrity of the procurement system:

> The override of the stay will not have an adverse impact on competition and the integrity of the procurement system. The purpose of the automatic stay is to preserve competition in contracting and ensure an effective process at the GAO. In some instances, an override may defeat the purpose of protest procedures, at least in part, by effectively preventing the protester from having an opportunity to compete for the contract. That is not the case here. For reasons explained above, DOE cannot award this task order to PMTech because there is no remaining contractual vehicle. Therefore, for all practical purposes, a stay override has no impact on PMTech's possible remedies. The stay override will not prevent the GAO from resolving the protest, and awarding bid and proposal costs

and attorney fees, should PMTech prevail on the merits.

AR at 562. The D & F therefore concludes that the override would not undermine competition in government contracting or the integrity of the procurement system.

Based on the considerations noted above, the D & F concludes that an override of the automatic stay was justified under CICA:

> There is a present threat to the safety and health at the ORNL due to ongoing contamination leaks from radioactive materials, and non-radioactive hazardous materials, from Buildings 3026 and 3038. Remediative measures have not succeeded in halting the leakage, and the possibility of additional leakage will increase as the structure of these buildings continues to deteriorate. Performance of the subject task order, awarded to SEC on March 30, 2010, is the only means to permanently eliminate hazards associated with the ongoing risks of contamination. For all practical purposes, SEC is the only contractor that can perform this task order since there is no contractual vehicle on which to award the task order to the protester. There are substantial and tangible benefits to an override, no significant adverse consequences to an override and no reasonable alternatives to an override. Moreover, the benefits of an override plainly outweigh any costs, and the override will not adversely impact competition and the integrity of the procurement system.

AR at 562.[7] Upon issuance of the stay override, defendant directed SEC to commence performance of the task order. AR Tab 18.

## II. Procedural History

On July 13, 2010, PMTech filed its verified complaint, as well as a motion and supporting memorandum seeking declaratory relief, a temporary restraining order, and preliminary and permanent injunctions enjoining SEC's

7. In the D & F, defendant also suggests that PMTech's bid protest may not have even triggered an automatic stay of performance under CICA for two reasons. First, defendant questions whether the mandatory stay provisions of CICA apply to the protest of a *task order,* as opposed to the award of a new contract. AR at 557. Second, defendant notes that it did not rescind its award of the task order to SEC fol-

lowing the dismissal of PMTech's second bid protest. For that reason, defendant suggests that the third bid protest was not filed within ten days of the initial award of the task order or within five days of a debriefing on the award, as required under CICA. *Id.* Because defendant did not rely upon either of those arguments in reaching its override decision, however, the court need not address them here.

performance of the protested task order. In its complaint and motion, plaintiff contends that the override decision was arbitrary and capricious because defendant has failed to substantiate its assertion that further delay of the proposed work would pose an imminent threat to public health and safety. According to plaintiff, defendant's assertions regarding the risk of delaying performance are inconsistent with the government's conduct during the course of the procurement and the availability of an incumbent contractor to perform the work on an interim basis. Plaintiff further avers that DOE is incorrect in its assertion that there is no contractual vehicle under which the work could be performed by PMTech. The decision to proceed with performance of the task order in light of the pending GAO protest, plaintiff argues, will undermine competition and the integrity of the procurement process. Plaintiff asserts that defendant's decision must be set aside because it does not meet the specific factors set forth in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*State Farm*), and *Reilly's Wholesale Produce v. United States*, 73 Fed.Cl. 705, 711 (2006) (*Reilly's Wholesale*). Finally, PMTech argues that it has satisfied each of the legal requirements for injunctive relief, although it should not be required to do so.[8]

The administrative record was filed on July 19, 2010, and, on July 21, 2010, defendant filed its response in opposition to PMTech's motion, which the court will treat as a cross motion for judgment on the administrative record. In its motion, defendant argues that its override decision was neither arbitrary nor capricious. Defendant rejects PMTech's assertion that the government must substantiate the actual risk of imminent danger or demonstrate that there is an emergency as a prerequisite to overriding a stay of performance under CICA. On the contrary, according to defendant, the government need only demonstrate that it reasonably determined that "urgent and compelling circumstances" justified the decision to override the automatic stay. Here, defendant

argues, the government reasonably determined that the override decision was warranted by the imminent risk of harm to public health and safety at the ORNL. Defendant further asserts that it was not required to consider the specific factors articulated by this court in *Reilly's Wholesale*. Nonetheless, defendant contends that it did in fact consider each of those factors in reaching its override decision, and that its consideration of those factors was reasonable. Finally, defendant argues that plaintiff has failed to meet the specific requirements for injunctive relief in this case.

On July 26, 2010, plaintiff filed its memorandum in reply to defendant's response, in which it argues that the override decision is not supported by the documents contained in the administrative record. Plaintiff first argues that the decision was based on outdated documents that cannot provide a reasonable basis for a finding of an imminent risk to public health or safety. In addition, plaintiff asserts that UT–Battelle's temporary remediation measures have prevented the spread of any contamination from the site and will continue to do so until the GAO renders a decision on the pending bid protest. Plaintiff also argues that defendant's claim of radioactive contamination due to high rainfall in May 2010 is inconsistent with the evidence in the record. Moreover, plaintiff asserts that there is no evidence to support defendant's claim that conditions on the site were getting worse in the months preceding the override decision. Plaintiff argues that defendant failed to consider the alternatives to an override of the automatic stay of performance, such as directing UT–Battelle to commence performance of the task order on an interim basis, awarding a sole-source contract to plaintiff for the work, awarding PMTech a backdated task order, or retroactively extending PMTech's base contract. Finally, plaintiff argues that declaratory relief is an appropriate remedy in this case, and that it should not be required to prove the elements necessary for an injunction.

---

8. In addition, plaintiff requested that the court order limited expedited discovery in connection with defendant's decision to override the auto-matic stay of contract performance. The filing of the administrative record by defendant has rendered that motion moot.

Defendant filed its reply on July 30, 2010, in which it first responds that UT–Battelle is not currently performing—nor is it capable of performing—the permanent remediation work required under the protested task order. On the contrary, according to defendant, UT–Battelle manages and operates the ORNL, while Clauss performs warranty services on work it has already performed under a subcontract with UT–Battelle. Defendant further argues that it did not base its override decision upon outdated documents. Rather, defendant states that there is no dispute that the documents accurately describe the conditions on the site, and that subsequent inspections of the buildings indicate that those conditions have only gotten worse since the documents were prepared. Defendant also disputes PMTech's claim that the ORNL did not experience heavy rainfall in May 2010. Defendant argues that it reasonably concluded that the contamination at Buildings 3026 and 3038 was getting worse, and that its conclusion was supported by ample evidence in the administrative record. Defendant argues that its override decision was based solely on the need to implement a permanent solution to prevent the spread of contamination to the surrounding area, and that it considered and reasonably rejected alternatives to the override. Defendant argues that an agency is not required to consider the so-called *Reilly's Wholesale* factors in determining whether to override an automatic stay. Finally, defendant asserts that plaintiff must meet all of the requirements for injunctive relief in this case.

The court held oral argument on the parties' motions on August 3, 2010. At the conclusion of the argument, the court issued a bench decision, in which it denied PMTech's motion for declaratory and injunctive relief and dismissed the instant suit. This opinion explains the legal basis of that decision.

## DISCUSSION

### I. Standard of Review for Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1 cross motions is akin to an expedited trial on the paper record. *Id.*

### II. Bid Protest Jurisdiction

Pursuant to the Tucker Act, this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### III. CICA Stay Overrides

The Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551–3556 (2006), provides that the timely filing of a bid protest with the GAO, and the timely notification of the contracting agency of the pending protest, triggers an automatic stay of contract performance while the protest is pending before the GAO. 31 U.S.C. § 3553(d)(3). CICA further provides, however, that the agency may nonetheless override the automatic stay and proceed with contract performance upon a written determination that either of the following requirements is met:

(I) performance of the contract is in the best interests of the United States; or

(II) urgent and compelling circumstances that significantly affect interests of the United States will not permit wait-

ing for the decision of the Comptroller General concerning the protest. 31 U.S.C. § 3553(d)(3)(C).[9]

## IV. Protests of CICA Stay Overrides are Within this Court's Jurisdiction and Subject to APA Review

▪ The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), defines this court's bid protest jurisdiction. 28 U.S.C. § 1491(b). The United States Court of Appeals for the Federal Circuit has held that this court possesses subject matter jurisdiction under the Tucker Act to review an agency decision to override an automatic stay of performance pursuant to CICA. *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289–90 (Fed.Cir. 1999). In exercising its jurisdiction under section 1491(b)(1), the court must review agency decisions in accordance with the standards set forth in section 706 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (2006). *See* 28 U.S.C. § 1491(b)(4); *Ala. Aircraft Indus., Inc.–Birmingham v. United States,* 586 F.3d 1372, 1373 (Fed.Cir.2009) (*Alabama Aircraft*) ("Under the statute, the Court of Federal Claims reviews the agency's decision according to the standards contained in the Administrative Procedure Act."). Section 706 provides, in relevant part, that a reviewing court may declare unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The court notes that protests of CICA stay override decisions by federal agencies have been decided by this court without extensive precedential guidance from the Federal Circuit. Aside from *RAMCOR,* which confirmed this court's jurisdiction over CICA override protests, the Federal Circuit has not discussed the standard of review for such cases. Even in *RAMCOR,* the Federal Circuit merely noted that "ADRA explicitly imports the APA standards of review into the Court of Federal Claims' review of agency decisions [to override the automatic stay otherwise required by CICA]." 185 F.3d at 1290. Nonetheless, the court's standard of review for all bid protests under ADRA, importing the APA's arbitrary and capricious standard found in 5 U.S.C. § 706(2)(A), has been extensively discussed by the Federal Circuit, and these precedential decisions provide adequate foundation for the court's inquiry here.[10] A brief review of the caselaw binding on this court is a good place to begin.

## V. Arbitrary and Capricious Review in Procurement Cases

▪ In *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324 (Fed.Cir.2001) (*Impresa* ), one of the first decisions describing this court's arbitrary and capricious standard of review under ADRA, the Federal Circuit noted "that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). The *Impresa* court reasoned therefore that "the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' and the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Id.* at 1332–33 (quoting *Latecoere,* 19 F.3d at 1356 and *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)). Thus, in the bid protest context, this court's arbitrary and capricious review must focus on the coherence and rationality of the agency's procurement decision, and must acknowledge

---

9. When an agency seeks to override an automatic stay of performance that was triggered by a *pre-award* GAO bid protest, that agency must find that the override is warranted by urgent and compelling circumstances. 31 U.S.C. § 3553(c)(2).

10. A second prong of the APA standard of review used in this court's bid protest decisions, that concerning a violation of procurement procedure or regulation, has not proved to be necessary in most CICA override cases, and will not be discussed here. *See, e.g., Chapman Law Firm Co. v. United States,* 67 Fed.Cl. 188, 191 (2005) ("Under the APA, the reviewing court may only overturn an agency action if the court finds that it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

the agency's discretion in procurement decisions.

■ In another early decision discussing this court's standard of review under ADRA, the Federal Circuit noted that:

> The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.

*Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed.Cir.2000) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Almost ten years later, the standard of review still requires deference. In one of the most recent Federal Circuit decisions addressing this standard, this court was admonished for substituting its judgment for the agency's expertise in procuring services to meet the needs of the government. *Alabama Aircraft*, 586 F.3d at 1376 (reversing an "impermissible substitution of the court's judgment for the agency's with regard to how the contract work should be designed" (citing *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856)). From these cases, it is clear that the standard of review in bid protests is highly deferential, that the court may not substitute its judgment for the agency's judgment, and that an agency's "rational reasoning and consideration of relevant factors," *Advanced Data Concepts*, 216 F.3d at 1058 (emphasis added), will survive review. Furthermore, in *Alabama Aircraft*, the Federal Circuit included this additional instruction from *State Farm*: " 'The scope of review under the 'arbitrary and capricious' standard is narrow....' " 586 F.3d at 1376 (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856).

■ With these cases in mind, it appears to the court that the arbitrary and capricious review of CICA stay override decisions, like this court's review of other procurement decisions, is fairly straightforward. The scope of review is narrow, deference to the agency is high, and the focus is on the coherence and rationality of the override decision. In addition, as previously stated, the court must decide whether the agency has considered "relevant factors" as it has chosen to override the stay provided to protestors by CICA. *Advanced Data Concepts*, 216 F.3d at 1058.

## VI. APA Review of the Agency's Consideration of Relevant Factors

■ Although "relevant factors" must be considered by an agency to survive APA review, the United States Supreme Court has not raised the arbitrary and capricious standard so high that perfectly expressed analyses are required of the agency:

> Under the arbitrary and capricious standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. The agency must articulate a rational connection between the facts found and the choice made. While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman*, 419 U.S. at 285–86, 95 S.Ct. 438 (citations and internal quotations omitted). The Federal Circuit, too, has not required that an agency's analysis be perfectly expressed, or be phrased according to a particular formula, to survive arbitrary and capricious review. For example, in *Nucor Corp. v. United States*, 414 F.3d 1331, 1341 (Fed. Cir.2005), the Federal Circuit noted that "the [International Trade] Commission's findings on the statutory issue of material injury by reason of imports and on the various subsidiary issues could have been more explicit, and the Commission's analysis of the reasons for its findings could have been more detailed." Nonetheless, the Commission's decision survived arbitrary and capricious review, because "judicial review of an agency's findings does not demand expansive discussion or rigid adherence to a specific formula, as long as the court can determine that the

statutory requirements have been satisfied." *Id.* From these cases, the need to consider "relevant factors" does not equate to a need to express the agency's consideration of those factors in a specified manner.

## VII. *State Farm's* Four–Part Test for Arbitrary and Capricious Agency Action, Cited in CICA Stay Override Cases

■ One of the most succinct descriptions of appropriate APA arbitrary and capricious review, and one which discusses the rationality of the agency's decision as well as the agency's consideration of relevant factors, is provided by *State Farm*:

> Normally, an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. at 43, 103 S.Ct. 2856. The Federal Circuit has cited *State Farm* and quoted its four-part test for determining whether agency decisions are arbitrary and capricious. *E.g., GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1302 (Fed.Cir.2008); *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355–56 (Fed.Cir.2005) (stating that the Federal Circuit "has frequently applied the *State Farm* standard in reviewing administrative decisions"). Although the Federal Circuit has not had occasion to quote this passage from *State Farm* in the bid protest context, the judges of this court have appropriately cited the *State Farm* four-part test for arbitrary and capricious agency action

when ruling on protests of CICA stay override decisions. *E.g., PlanetSpace Inc. v. United States*, 86 Fed.Cl. 566, 567 (2009); *Nortel Gov't Solutions, Inc. v. United States*, 84 Fed.Cl. 243, 246 (2008).

## VIII. *Reilly's Wholesale* Factors

■ After citing the *State Farm* standard, some judges of this court have applied six additional factors that test whether the agency has considered the relevant factors and the important aspects of its CICA stay override decision. *E.g., E–Management Consultants, Inc. v. United States*, 84 Fed.Cl. 1, 5 (2008); *Reilly's Wholesale*, 73 Fed.Cl. at 711. *Reilly's Wholesale* identified four factors that an agency "must consider" when contemplating a CICA stay override, and two factors that are "irrelevant" to such a decision.[11] 73 Fed.Cl. at 711. The court concluded that "for its override decision to be upheld, the agency must not only sort between these relevant and irrelevant factors, but must also render findings with respect to those that are relevant that do not 'run [ ] counter to the evidence before the agency.'" *Id.* (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856, and citing *CIGNA Gov't Servs., LLC v. United States*, 70 Fed.Cl. 100, 111–13 (2006); *Keeton Corrections, Inc. v. United States*, 59 Fed.Cl. 753, 755 (2004)). The court in *Reilly's Wholesale* has provided excellent guidance to this court, and to the procurement community, in identifying factors that may be relevant to most CICA stay override decisions. As to the precedential weight to be accorded the *Reilly's Wholesale* factors, however, the court in this decision must express some reservations.

■ The court notes first that decisions in other cases before this court are not binding in this proceeding. *See W. Coast*

---

11. The relevant factors identified by *Reilly's Wholesale* are:

(1) whether significant adverse consequences would occur if the agency did not override the stay, (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including costs associated with the potential that the protester might prevail before GAO, and (4) the impact of the override on the competition and integrity of the procurement system.

*E–Management*, 84 Fed.Cl. at 5 (citation omitted). The irrelevant factors are:

[1] that the new contract would be better than the old one, [and]

[2] the override and continuation of the contract is otherwise simply preferable to the agency.

*Reilly's Wholesale*, 73 Fed.Cl. at 711 (citations omitted).

*Gen. Corp. v. Dalton,* 39 F.3d 312, 315 (Fed. Cir.1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.") (citations omitted) The court also notes that "[a]s indicated by review of [this court's] cases decided for and against an override, override cases are fact specific." *Automation Techs., Inc. v. United States,* 72 Fed.Cl. 723, 730 (2006). The utility of the factors identified in *Reilly's Wholesale* may thus vary from case to case, and until the Federal Circuit provides further guidance in this area, *Reilly's Wholesale* provides a standard of review for CICA stay overrides to the extent that the factors identified therein are deemed helpful in deciding the case at hand. *See Analysis Group, LLC v. United States,* No. 09–542C, 2009 WL 3747171, at *3 (Fed.Cl. Nov. 5, 2009) (stating that while the *Reilly's Wholesale* "factors may be helpful in analyzing the agency's override decision, they are not dispositive").

## IX. A Comparison of the Text of CICA with the *Reilly's Wholesale* Factors

The court turns to a comparison of the CICA provisions governing stay overrides and the *Reilly's Wholesale* factors. CICA stay overrides, in the post-award context, may be based on either the "best interests of the United States" or "urgent and compelling circumstances." 31 U.S.C. § 3553(d)(3)(C). These two rationales are separately stated in the statute, and the terms "best interests of the United States" and "urgent and compelling circumstances" do not appear to the court to be perfectly synonymous, co-extensive or redundant. When a statute provides two categories of conditions in two separate clauses, a court must attempt to give each category an independent meaning. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (noting that two clauses of the statute relied on in that case identified "two categories of cases," and holding that the court below "properly accorded both . . . clauses independent meaning"). Thus, a reasonable reading of CICA suggests that factors relevant to a "best interests" override may not always be relevant to an "urgent and compelling" override.

Indeed, although the statute allows either rationale to justify post-award CICA stay overrides, CICA permits only "urgent and compelling" overrides in pre-award situations. 31 U.S.C. § 3553(c)(2)(A). As this court has commented, one explanation for the provision of two post-award rationales, as opposed to a single pre-award rationale, is that Congress authorized agencies to rely on an additional, distinct rationale to justify certain post-award override decisions, when "urgent and compelling circumstances" were not present. *See Spherix, Inc. v. United States,* 62 Fed.Cl. 497, 507 (2004) (noting that "the 'best interests' exception in section 3553(d)(3)(C) is not an acceptable reason for authorizing a stay under section 3553(c)(2)(A)," and commenting that the distinction between pre-award and post-award override rationales reflected a less restrictive Congressional intent regarding post-award CICA stay overrides). Given the distinctions drawn in the statutory text, it is unlikely that the relevant factors for a "best interests" override would be exactly the same as the relevant factors for an "urgent and compelling" override.

The court notes that some aspects of the *Reilly's Wholesale* factors are founded on this court's analysis of "best interests" CICA stay overrides, and the *Reilly's Wholesale* factors do not appear to distinguish between the separate categories of "best interests" and "urgent and compelling" CICA stay overrides. 73 Fed.Cl. at 711 n. 10 (stating that "the rationale employed in ['best interests'] cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances"). The *Reilly's Wholesale* factors were originally developed to review an "urgent and compelling" override decision, but the court in *Reilly's Wholesale* identified numerous "best interests" override cases as source material for the factors relevant to "urgent and compelling" override decisions. 73 Fed.Cl. at 711. The *Reilly's Wholesale* factors have since been applied to both "best interests" overrides, *e.g., E–Management,* 84 Fed.Cl. at 3–5, and "urgent and compelling overrides," *e.g., EOD Tech., Inc. v. United States,* 82 Fed.Cl. 12, 16, 20 & n. 8 (2008). To the extent that

the *Reilly's Wholesale* opinion might be interpreted to identify the relevant factors for both "best interests" as well as "urgent and compelling" CICA stay override decisions, and to disregard any distinction between these two categories of override decisions, such an application of *Reilly's Wholesale* does not appear to be supported by the text of CICA.

 The court now turns to the statutory requirements for CICA stay overrides based on urgent and compelling circumstances. The text of CICA, in relevant part, requires an agency to make findings that:

> [U]rgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i)(II); *see also* 48 C.F.R. §§ 33.103(f)(3), 33.104(d) (2009) (requiring written justification of a CICA stay override decision, and that "the contracting officer shall include the written findings or other required documentation in the file"). In the court's view, the agency's written findings supporting an "urgent and compelling" override decision can be adequately tested against these simply stated but important statutory requirements by applying the four-factor test set forth in *State Farm*. *State Farm's* expression of the APA standard of review is binding on this court.

To go further, as *Reilly's Wholesale* appears to counsel, and insist that the agency's written findings answer a rigorous set of questions that spring not from the text of CICA and not from the well-established APA standard of review expressed in *State Farm*, but from this court's own jurisprudence in discussing both "best interests" and "urgent and compelling" overrides and from this court's analysis of CICA's legislative history, is another matter.[12] *Reilly's Wholesale* states that an agency *must* consider four relevant factors that this court has identified, *must* sort through these four relevant factors and two irrelevant factors that this court has identified, and *must* make findings with respect to the relevant factors specified in *Reil-*

*ly's Wholesale*, 73 Fed.Cl. at 711. If this court over-zealously applies the *Reilly's Wholesale* factors to a CICA stay override decision, such a review could exceed the narrow, highly deferential, "no rational basis" standard of review set forth in *State Farm, Bowman, Alabama Aircraft, Impresa,* and *Advanced Data Concepts.* The court's focus should be on whether the CICA stay override decision was rational and whether the agency considered relevant factors, not on whether the agency conformed its analysis to a specific framework elaborated by this court. *See Nucor,* 414 F.3d at 1341 (stating that "judicial review of an agency's findings does not demand expansive discussion or rigid adherence to a specific formula, as long as the court can determine that the statutory requirements have been satisfied"). For these reasons, the court recognizes the utility of the analytical framework provided by *Reilly's Wholesale,* but does not consider that the *Reilly's Wholesale* factors govern the outcome of this case.

## X. How Does CICA Define Urgent and Compelling Circumstances?

CICA itself does not define "urgent and compelling circumstances" permitting the override of a CICA stay. *See* 31 U.S.C. § 3551 (not including "urgent and compelling circumstances" in the list of CICA's defined terms). As Congress prepared to reconcile various bills that would become CICA, however, the terms "urgent" and "compelling" were used to describe situations permitting sole-source procurements, and that use of "urgent" and "compelling" provides at least some sense of the meaning of these terms:

> The second exception allows sole-source procurement when the agency's need for the property or services is of such unusual and compelling urgency that the government would be seriously injured by the delay involved in using competitive procedures. This exception strengthens the present 'public exigency' exception by incorporating regulatory language which requires that the agency's need must be 'compelling and of unusual urgency, as when the government would be seriously

---

12. The court addresses CICA's legislative history *infra.*

injured—financially or otherwise—if the supplies were not furnished by a certain date.' An urgent situation is one which threatens immediate harm to health, welfare, or safety.

S.Rep. No. 98–50, at 21 (1983) (citations omitted) as reprinted in 1984 U.S.C.C.A.N. 2174, 2194. The "linguistic similarity" of the two formulations, Filtration Dev. Co. v. United States, 59 Fed.Cl. 658, 663 (2004), which now appear in different sections of the United States Code, compare 31 U.S.C. § 3553(d)(3)(C)(i)(II) with 10 U.S.C. § 2304(c)(2) (2006) and 41 U.S.C. § 253(c)(2) (2006), suggests some overlap in meaning. A threat of immediate harm to health, welfare or safety would appear to qualify as "urgent and compelling circumstances" for the purposes of CICA stay overrides, just as a threat of immediate harm to health, welfare or safety would create a situation where the "unusual and compelling urgency" of agency needs permits a sole-source procurement.

## XI. What Relevant Factor or Factors for Stay Overrides are Specifically Noted in the Legislative History of CICA?

The text of CICA does not require the consideration of any particular factor or factors when an agency overrides a CICA stay. Upon close examination of CICA's legislative history, the court has found no mention of a specific factor or factors that should be considered to determine whether "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i)(II). There is, however, mention of one factor that an agency should consider when determining the best interests of the United States:

Before notifying the Comptroller General that continued performance of a disputed contract is in the government's best interest, however, the head of the procuring activity should consider potential costs to the government from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained. This is to insure that if the Comptroller General sustains a protest, such forms of relief as termination, recompetition, or re-award of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's best interest would not be served by relief measures of this sort because of the added expense involved. This provision is designed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

H.R.Rep. No. 98–861, at 1436 (1984) (Conf. Rep.) as reprinted in 1984 U.S.C.C.A.N. 1445, 2124 (emphasis added).

The court notes that this statement of Congressional intent is tied to the determination of the "government's best interests" and appears to relate to the "best interests" post-award override rationale described in 31 U.S.C. § 3553(d)(3)(C)(i)(I). The court is unconvinced that a consideration of the costs of remedies that may be afforded a protestor by the GAO is necessarily required when an agency invokes the "urgent and compelling" post-award override rationale sanctioned by 31 U.S.C. § 3553(d)(3)(C)(i)(II). Instead, the court believes the agency must first measure the urgency of the procurement situation, as discussed above, and determine whether an immediate threat of harm to health, welfare or safety exists. Then, the agency must weigh that urgency against the priorities expressed in CICA.

CICA enhances competition by strengthening GAO's monitoring of government procurements, among other means. One of the goals of CICA was "to provide [the GAO] with a statutory base for its bid protest function." H.R.Rep. No. 98–861, at 1421 (1984) (Conf. Rep.) as reprinted in 1984 U.S.C.C.A.N. 2109. As stated in CICA's legislative history, "[t]he conferees believe that a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced and that vendors wrongly excluded from competing for government contracts receive equitable relief." Id. at 1435, 1984 U.S.C.C.A.N. 2123. Thus, in the court's view, a rational decision to override a CICA stay on the basis of "urgent and compelling circumstances" requires the agency

to reasonably assess the urgency of the agency's need, and to reasonably weigh that urgency against the need to promote competition through a "strong enforcement mechanism" capable of providing equitable relief to a successful protestor. Such a decision-making process, if supported by the factual record, would survive the arbitrary and capricious standard of review set forth in *State Farm*.

■ In some instances, an "urgent and compelling" override, to be rational, might require that the agency examine the potential costs of equitable remedies recommended by the GAO. In some instances, an "urgent and compelling" override, to be rational, might require consideration of all of the *Reilly's Wholesale* factors. Nothing in CICA's text or legislative history, however, compels an agency to consider all of the *Reilly's Wholesale* factors whenever the agency invokes the "urgent and compelling circumstances" rationale for a CICA stay override. Rather, in accordance with the legislative history of CICA, the agency, to survive arbitrary and capricious review, must support its override decision with a rational assessment of the urgency of the agency's need, and with a rational weighing of that urgency against the integrity of GAO's bid protest function. Beyond these basic principles, the court has not found any indication in CICA's legislative history that specifically enumerated relevant factors for "urgent and compelling" override decisions were identified by Congress, or that Congress specifically identified factors which are irrelevant to the agency's "urgent and compelling" override decision. Thus, it is this court's opinion that a consideration of the applicable statutes, legislative history and controlling precedent, as discussed above, irrevocably directs and focuses the court's analysis upon the factors set forth in *State Farm* for its decision on the CICA stay override presented in this case.

## XII. Relief that May Be Afforded to a Protestor if a CICA Stay Override is Arbitrary or Capricious

■ There is a split in the precedent of this court as to whether declaratory relief or injunctive relief should be afforded the successful protestor of a CICA stay override. Some cases indicate that declaratory relief is better suited to the purposes of resolving the dispute. *E.g., Nortel*, 84 Fed.Cl. at 252 (citing cases and explaining why declaratory relief is in accordance with CICA's statutory scheme). Other cases hold that injunctive relief provides the protestor with an appropriate remedy. *E.g., Reilly's Wholesale*, 73 Fed.Cl. at 709 n. 7. The court recognizes the split in precedent, and the strong arguments that favor both perspectives on this issue, but views declaratory relief as a more appropriate remedy in CICA stay override cases.[13] *See, e.g., Advanced Sys. Dev., Inc. v. United States*, 72 Fed.Cl. 25, 36–37 (2006) (noting that even where a plaintiff "requests an injunction, we find that a declaratory judgment achieves the same effect"); *CIGNA*, 70 Fed. Cl. at 114 (commenting that in providing declaratory relief, "the Court has taken into account the necessity of resolving this matter expeditiously recognizing that each day that passes prolongs the time when the stay is not in effect").

In a case where the record does not support a finding that the agency's decision is arbitrary or capricious, however, the distinction between declaratory relief and injunctive relief is of little import. To win declaratory relief, the plaintiff must show that the override decision was arbitrary or capricious. To win injunctive relief, the protestor must show that it was likely to succeed, or has succeeded, on the merits, *i.e.*, that the override decision was likely to be found, or was found, to be arbitrary or capricious. Although in a

---

13. Defendant relies heavily on *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed.Cir. 2004), for the proposition that "[i]n any CICA override case that seeks to prevent continued performance of a Government contract, the Court must apply the equitable relief standards applicable to requests for an injunction." Def.'s Mot. at 18. This court's bid protest jurisdiction includes the power to issue either declaratory or injunctive relief, 28 U.S.C. § 1491(b)(2), and *PGBA* did not address the type of relief required in CICA stay override protests. The court disagrees with defendant and agrees with the reasoning presented in *Chapman Law Firm Co. v. United States*, 65 Fed.Cl. 422, 424 (2005), which states that declaratory relief is more in keeping with CICA's automatic stay provisions.

close case the distinction between declaratory relief and injunctive relief might indeed change the outcome of the court's review of a CICA stay override, this is not such a case.

### XIII. Standing

 The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302).

 Defendant has not directly challenged PMTech's standing to bring this protest of the agency's CICA stay override decision. The court acknowledges that standing is not often discussed at length in CICA stay override cases, and the court is only aware of two cases which address standing in this context. *See E–Management,* 84 Fed.Cl. at 5 (briefly addressing the issue of standing in that case); *Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573, 576–79 (2003) (discussing standing at some length, in a case where the protestor had failed to bid on all of the regional contract awards in regards to which CICA stays had been overridden). In this case, PMTech bid on the procurement which was stayed pending its protest at the GAO, and it is the override of the CICA stay triggered by PMTech's GAO protest that is at issue here. Although the exact mechanism through which PMTech could be awarded the task order has yet to be identified, the GAO, should it sustain PMTech's protest, theoretically may be able to craft an equitable remedy not immediately

apparent to this court. The court thus finds that PMTech has a direct economic interest in this procurement and has standing to bring this suit.[14]

### XIV. The Agency's Override Decision Was Not Arbitrary or Capricious

Plaintiff argues that defendant's decision to override the automatic stay of performance triggered by the pending GAO protest was arbitrary and capricious. In support of that assertion, plaintiff first argues that defendant based its override decision on a number of factors that it is not permitted to consider under CICA. Next, plaintiff claims that defendant entirely failed to consider several important issues, such as the availability of alternatives to an override, in reaching its decision. Finally, plaintiff contends that defendant's purported justification for the override decision was not supported by the evidence in the administrative record.

 The court first notes that it is not required to consider the merits of the underlying bid protest that triggered the automatic stay, the override of which is now challenged in this court. *See Unisys Corp. v. United States,* 90 Fed.Cl. 510, 517 (2009) ("Although 'the Comptroller General of the United States' has 'exclusive jurisdiction' over protests of task orders valued in excess of $10 million, this lawsuit does not concern the task order itself, but merely whether [the agency] complied with 31 U.S.C. § 3553."); *Automation Technologies,* 72 Fed.Cl. at 727 ("The issue ... before this court is the propriety of the agency's override of the automatic stay resulting from the GAO protest, not the merits of the solicitation process."); *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 658 (2003) (noting that "the Federal Circuit [has] determined that this court could review the merits of an override independent of any consideration of the merits of the underlying contract award"). For that reason, the court need not address the parties' unnecessary discussion

---

**14.** This court weighs prejudice as it pertains to standing less thoroughly than it weighs prejudice that would entitle a protestor to relief on the merits of its bid protest. *See, e.g., Night Vision Corp. v. United States,* 68 Fed.Cl. 368, 392 & n.

23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing").

of the merits of PMTech's bid protest. *See* Compl. ¶¶ 20–26, 30; Def.'s Resp. at 5–7.

■ Here, the court's review is limited to the reasonableness of defendant's decision to override the automatic stay of performance. As noted above, the court's review of the override decision is governed by the standards set forth in *State Farm.* For the reasons discussed below, the court concludes that the agency's decision was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law.

## A. The Agency Did Not Base the Override Decision upon Factors Congress Did Not Intend It to Consider

Plaintiff asserts that defendant based its override decision, at least in part, on "factors which Congress has not intended it to consider." *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856. However, the court found nothing in CICA, or in relevant FAR provisions, to indicate that Congress identified any specific factors that an agency may not consider when deciding whether or not to override a CICA stay on the basis of "urgent and compelling circumstances." The challenged override decision therefore necessarily meets the first prong of the *State Farm* analysis. Nonetheless, the court will address those issues plaintiff asserts the government should not have considered in reaching its override decision.

Plaintiff first argues that defendant cannot base its override decision on a mere preference to begin performance now rather than later. *See* Pl.'s Reply at 13. However, defendant did not base its override decision on a mere preference for earlier performance. On the contrary, defendant rationally determined that waiting for the GAO to render a decision on the pending bid protest before commencing performance of the task order would pose an unacceptable risk to human health and safety. In the D & F, defendant concludes that:

> [t]here is a present threat to the safety and health at the ORNL due to ongoing contamination leaks from radioactive materials, and non-radioactive hazardous materials, from Buildings 3026 and 3038. Remediative measures have not succeeded

in halting the leakage, and the possibility of additional leakage will increase as the structure of these buildings continues to deteriorate. Performance of the subject task order, awarded to SEC on March 30, 2010, is the only means to permanently eliminate the hazards associated with the ongoing risks of contamination.

AR at 562. As discussed above, the legislative history of CICA suggests that a threat of immediate harm to health, welfare or safety is a legitimate basis for a CICA override based on urgent and compelling circumstances. *See* Opinion Section X *supra.* In short, plaintiff cannot reasonably assert that Congress has foreclosed the consideration of such health and safety concerns in the CICA override context.

Plaintiff further asserts that the potential displacement of SEC employees was an impermissible consideration in defendant's decision to override the stay of performance. Pl.'s Reply at 13. That argument fails for at least two reasons. First, as noted above, there is no legal support for the argument that Congress intended to preclude the consideration of *any* relevant factor in CICA overrides based on urgent and compelling circumstances. While the prevention of unemployment might be an insufficient justification for an override decision on that basis, such consequences may be a legitimate consideration in an agency's decision to override an automatic stay of performance under CICA. More important, however, is the fact that there is no evidence that defendant actually relied upon the potential displacement of SEC employees in reaching its override decision. In support of its argument, plaintiff references an internal agency document noting that an override of the automatic stay would prevent the loss of jobs caused by the down-staffing of other ARRA-funded projects. *See* AR at 554. However, that concern is not referenced in the D & F, which is the agency decision under review in this case.

## B. The Agency Did Not Fail to Consider an Important Aspect of the Override Decision

An agency decision may be set aside as arbitrary and capricious if the agency entire-

ly failed to consider an "important aspect of the problem" in reaching that decision. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. According to plaintiff, defendant failed to consider at least three relevant issues in this case. First, plaintiff argues that defendant did not consider the reasonable alternatives to an override of the stay. Second, plaintiff contends that defendant did not consider the impact of the override on competition and the integrity of the procurement system. Finally, plaintiff states that defendant failed to consider the possibility that SEC is not a small business and is therefore ineligible for the protested task order.

### 1. The Agency Considered Reasonable Alternatives to Its Override of the Automatic Stay of Performance

Plaintiff first argues that defendant failed to consider all of the available alternatives to an override of the automatic stay. According to plaintiff, defendant could have allowed UT–Battelle to perform the permanent remediation work on an interim basis, could have awarded a sole-source contract to PMTech for the work included under the task order, could have retroactively extended the effective date of PMTech's base contract to facilitate the award of the task order to plaintiff, or could have awarded plaintiff a backdated task order. Because none of the alternatives proposed by plaintiff are reasonable, defendant was not required to consider them in reaching its decision. *See Analysis Group*, 2009 WL 3747171, at *5 ("CICA's command is for 'reasonable alternatives' to exist, not just 'alternatives.'"); *Reilly's Wholesale*, 73 Fed.Cl. at 711 (holding that an agency must consider "whether *reasonable* alternatives to the override exist that would adequately address the circumstances presented") (emphasis added).

First, the D & F states that the work contemplated under the task order is not being performed by any incumbent contractor. AR at 556, 561. The remediation and decontamination measures performed by UT–Battelle are temporary in nature, and the D & F concludes that the task order must be performed as soon as possible because the temporary measures have not been successful in containing the spread of con-

tamination on the site. AR at 558. For that reason, the D & F also rejects the option of simply waiting while the GAO bid protest runs its course. AR at 561. The D & F further states that directing UT–Battelle to begin the permanent work under the task order, and later transferring that work to another contractor, would be infeasible and would have an adverse effect on the competitive process. *Id.* The court holds that defendant's analysis of the pitfalls entailed in the utilization of UT–Battelle for the permanent remediation work was sound as well as rationally set forth and that its conclusions were reasonable.

The D & F also addresses the possibility of holding a new procurement for the task order, and concludes that a new competition would not be an acceptable alternative to the override because it could take as long as a year to complete such a procurement. AR at 561. In light of the asserted risks to public health and safety, defendant determined that delaying performance for such a long period of time would be unacceptable. *Id.* Given the protracted history of the procurement at issue here, the court concludes that defendant's rejection of this option was reasonable.

With respect to PMTech's suggestion that provisions could be made to allow plaintiff to provide the services, the D & F expressly notes that all of the IDIQ base contracts have expired and that no new task orders may be issued under those contracts. AR at 556. Plaintiff has provided no legal authority for its novel suggestion that defendant may retroactively amend PMTech's base contract, which expired before the current bid protest was even filed, in order to award the protested task order to plaintiff. Nor has plaintiff cited any legal support for its argument that defendant has the authority to award PMTech a backdated task order that falls within the period during which the base contract was effective. Because those proposed alternatives have no apparent basis in law, defendant was not required to consider those options in reaching its override decision.

Finally, PMTech's assertion that defendant should award a sole-source contract to plaintiff for the work contemplated under the task order is similarly unreasonable. Plaintiff has

not identified any potential legal basis for such an award. PMTech does not assert, for example, that there is only one responsible source for the services to be procured, *see* 48 C.F.R. § 6.302–1 (2009), and the award of the task order to SEC clearly demonstrates that PMTech is not the only contractor capable of rendering those services. In addition, any claim by plaintiff that a sole-source contract may be awarded on the basis of "unusual and compelling urgency," *see* 48 C.F.R. § 6.302–2 (2009), would be wholly inconsistent with its principal argument that the government's override decision is not warranted by urgent and compelling circumstances. Because the award of a sole-source contract to PMTech is not a reasonable alternative to an override of the automatic stay of performance, defendant was not required to consider that option.

**2. The Agency Considered the Impact of Its Override Decision on Competition and the Integrity of the Procurement System**

Plaintiff next argues that defendant did not consider the adverse impact of its override decision on the interests of competition and the purposes of CICA. That argument is belied by the D & F. As evidenced by that document, defendant considered the range of equitable and monetary remedies that the GAO might provide to PMTech, and concluded that the costs of such remedies were greatly outweighed by the risks of delaying performance of the task order until the GAO resolved the bid protest. AR at 561–62. The D & F first notes that PMTech was no longer qualified to receive this task order because its base contract had expired, and that SEC, "whatever the resolution of the GAO protest," would most likely perform the services under the task order. AR at 561. The D & F then discusses the potential costs of a GAO decision sustaining PMTech's protest:

> Therefore, even if PMTech were to prevail in this protest, its remedies would not be affected by this override. In all probability, based on GAO precedent in cases where it is impractical for a successful protester to perform, PMTech's remedies would be limited to bid and proposal costs and attorney fees. The override will not increase these bid and proposal costs. It

is highly unlikely GAO would recommend contract award to PMTech, a new task order competition or that DOE recompete the requirement.

AR at 561–62. Defendant determined that proceeding with performance of the task order by SEC would do nothing to undercut the remedies that the GAO could provide to PMTech and would not undermine competition or the integrity of the procurement process:

> The override of the stay will not have an adverse impact on competition and the integrity of the procurement system. The purpose of the automatic stay is to preserve competition in contracting and ensure an effective process at the GAO. In some instances, an override may defeat the purpose of protest procedures, at least in part, by effectively preventing the protester from having an opportunity to compete for the contract. That is not the case here. For reasons explained above, DOE cannot award this task order to PMTech because there is no remaining contractual vehicle. Therefore, for all practical purposes, a stay override has no impact on PMTech's possible remedies. The stay override will not prevent the GAO from resolving the protest, and awarding bid and proposal costs and attorney fees, should PMTech prevail on the merits.

AR at 562. The court concludes that defendant considered all likely remedies, and reasonably determined that proceeding with performance of the task order, in this instance, would not frustrate the ability of the GAO to fashion any potentially available equitable remedy for PMTech. Thus, the government considered the costs of various GAO remedies that might be afforded PMTech as a result of its protest, and weighed the costs of those remedies against the benefits of overriding the CICA stay.

In addition, defendant posited that awarding the task order to UT–Battelle on an interim basis—as plaintiff suggests—would actually undermine competition and the integrity of the procurement process because UT–Battelle did not participate in the competition for the task order. AR at 561. In short, defendant did not ignore the impact of

its override on competition and the integrity of the procurement system, but rationally weighed the urgency of its procurement need against the overall goal of increased competition. The court cannot substitute its judgment for the agency when a rational conclusion, based on the findings in the record, was reached.

### 3. Defendant Was Not Required to Consider the Remand of the SBA's Size Determination

■ Finally, plaintiff argues that defendant failed to consider that the SBA might reverse its earlier decision that SEC meets the size requirements set forth in the RFTP. Although the SBA has determined that SEC is an eligible small business, plaintiff notes that OHA has remanded that decision to the SBA for further review. However, the reasonableness of the stay override must be evaluated based on the evidence that was available to the government when its decision was made. *See, e.g., Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (explaining that in reviewing agency action under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). When defendant issued its D & F, the SBA had denied the size protest plaintiff had filed with the SBA. OHA's subsequent decision could not have been considered by defendant because it was not rendered until five days after the stay override was issued. In short, PMTech's contention that defendant should have considered the possibility that the SBA might revise its earlier decision is without merit.

### C. The Agency Did Not Offer an Explanation for Its Override Decision that Is Inconsistent with the Evidence

■ The court must set aside an override decision as arbitrary and capricious if that decision "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 42, 103 S.Ct. 2856. However, the court must uphold the decision as long as it is supported by the evidence, even if the court disagrees with the wisdom of that decision. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S.

402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("Although this inquiry into the facts must be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Plaintiff asserts that defendant's proffered justifications for its override decision are not supported by the evidence in the administrative record. The court disagrees. As discussed below, the decision to override the CICA stay was supported by sufficient evidence in the record before the agency.

### 1. Effectiveness of Temporary Decontamination Efforts and Risk of a Future Contamination Incident

Plaintiff first argues that delaying the permanent remediation work under the protested task order would not result in any imminent danger to the public because the temporary measures implemented by UT–Battelle have successfully prevented the spread of radioactive contamination from the site. Defendant, in contrast, argues that the measures implemented by UT–Battelle have not been effective, as evidenced by the frequent decontamination efforts required since the removal of the wooden superstructure of Building 3026. In addition, defendant argues that the periodic decontamination of released radiation does not eliminate the risk of a significant contamination event in the future. Defendant's assessment of the ineffectiveness of the temporary remediation measures and the risk of a future contamination incident is supported by the administrative record.

Plaintiff points to a number of statements in the administrative record that are purportedly inconsistent with defendant's assertion of an imminent risk to public health and safety. As discussed below, the statements cited by plaintiff do not undermine defendant's finding of urgent and compelling circumstances.

Plaintiff first references a statement contained in an e-mail sent on June 15, 2010, which discusses the then-current condition of Building 3026. *See* AR at 357. The refer-

enced document notes that "Clauss and InstaCote representatives were on site from June 2–4, *evaluating the coating and making repairs as needed.*" AR at 358 (emphasis added by plaintiff). In citing this language, PMTech appears to assert that the repairs performed by Clauss and InstaCote have eliminated the risk of a future contamination event at Building 3026. However, the report explains that Clauss and InstaCote were required to perform the referenced repairs and decontamination of Building 3026 because the polyurea sealant *had failed* in preventing the spread of contamination on the site, and that the contamination would likely reappear in the future. AR at 591–92.

Plaintiff next cites a number of statements from a report describing the temporary remediation and decontamination efforts of Building 3026. *See* AR at 587–95. PMTech notes, for example, that there has been no spread of radioactive contamination on the "vast majority" of the site, and that the 3026C portion of the facility has been downposted and no longer requires the use of personal protective equipment. *See* AR at 592. In addition, plaintiff notes that UT–Battelle and InstaCote have performed decontamination work and have repaired the polyurea coating on the hot cells on a number of occasions, *see* AR at 591–92, and that such efforts have reduced contamination by an order of magnitude, *see* AR at 592. Following decontamination, as plaintiff notes, "the majority of the area, while still a decontamination area, did not exhibit reoccurrence of contamination as regularly or to the same extent." *See* AR at 591.

None of the above statements undermines the assertion that the failure to immediately proceed with the task order would pose an imminent risk to human health or safety. The assertion that there has been no spread of contamination on a "vast majority" of the site implies that there has in fact been such spread on the remainder of the site. Likewise, the statement that "the majority of the area" did not exhibit the recurrence of contamination "as regularly or to the same extent" could imply both that: (1) the majority

of the site continued to exhibit recurrence of contamination, although not to the same degree; and (2) the remainder of the site continued to exhibit contamination to the same extent and at the same frequency. Finally, the claim that protective wear is no longer required on the 3026C portion of the facility implies that such protective wear is required on the 3026D portion of the building, which is the principal area of concern as it contains both the charging room and the two most contaminated hot cells. AR at 587. As discussed in more detail below, moreover, the fact that decontamination efforts temporarily reduced radiation levels by an order of magnitude does not indicate that the risk of future contamination has been obviated.

In further support of its argument that current decontamination efforts are sufficient, plaintiff notes that the level of removable beta-gamma contamination in the charging room adjacent to the hot cells in Building 3026 reached 784,313 on May 7, 2010, but had fallen to only 274,000 near the end of June 2010.[15] Pl.'s Reply at 7. Based upon that comparison, plaintiff concludes that the levels of radioactive contamination on the site were *improving* in the months prior to the override decision. PMTech's selective use of the evidence in the administrative record is misleading and must be placed in its proper context.

Following the demolition of the wooden superstructure of Building 3026, removable contamination levels in the charging room have followed a recurrent and predictable pattern. UT–Battelle would decontaminate the facility, which significantly reduced the level of radiation. Within days of each decontamination, however, the radiation began to return to high levels. On April 30, 2010, for example, the measured level of loose contamination in the charging room was only 2630. AR at 594. In just *one week*, however, that level had increased to 784,313. *Id.* UT–Battelle decontaminated the facility the same day, and the contamination level fell to just 9130. *Id.*

By May 14, 2010, the contamination level in the tracks on the floor of the charging

---

**15.** The figures in this section refer to levels of removable or "loose" beta-gamma contamina-

tion measured in disintegrations per minute (dpm) per 100 square centimeters.

room had increased to 10,578. *Id.* Following another decontamination of the site, the level of removable contamination in isolated spots was reduced to less than 200. *Id.* However, the contamination level in the charging room then reached 7742 on May 21, 2010, and 10,577 in the tracks on May 27, 2010. *Id.* The next day, the tracks in the facility were decontaminated, and the radiation level once again fell to less than 200. AR at 595.

On June 2, 2010 and June 3, 2010, Clauss and InstaCote performed repair and patching work on the polyurea coating covering the walls of the hot cells and the Building 3026 slab. *Id.* By June 4, 2010, the level of radiation in the charging room had climbed to 13,611, fell to less than 200 on June 10, 2010, and then increased slightly to 503 in one of the tracks on June 17, 2010. *Id.* Then—in a period of just six days—the level of radiation in the charging room increased from just 503 to 274,000. *Id.* In other words, the level of radioactive contamination in the charging room was more than 500 times higher on June 23, 2010 than it was less than one week earlier. PMTech's assertion that conditions in Building 3026 were improving in the months preceding defendant's override decision is contradicted by the administrative record.

Defendant rationally concluded that the temporary measures performed by UT–Battelle have not been successful in preventing the recurrence of radioactive contamination and have not eliminated the risk of a future contamination event. Because that conclusion is supported by the administrative record, it is neither arbitrary nor capricious.[16]

### 2. Failure to Notify the Public or the Advisory Board

 Plaintiff also claims that defendant's assertion of urgent risk is belied by its failure to communicate that risk to the Oak Ridge Site Specific Advisory Board (Advisory Board) or the public at large. Defendant responds that it was not legally required to notify the Advisory Board or the general public of the contamination, and its failure to

do so was motivated by a reasonable concern that such an announcement could create a state of panic in the surrounding area. The court need not determine whether defendant made the "correct" choice in declining to notify the Advisory Board or the general public about the risk of radioactive contamination; on the contrary, the court need only conclude that the override decision had a rational basis, and that the evidence in the record supports that decision. The court does not see an inconsistency between defendant's decision not to warn the Advisory Board or the public of the risk of contamination and its decision to proceed promptly with its decontamination efforts. As long as " 'the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). The court concludes that defendant's failure to publicize the risk of contamination is not necessarily inconsistent with its assertion that the override decision was based on urgent and compelling circumstances.

### 3. Documents upon which Defendant Relied

Plaintiff also argues that defendant unreasonably relied upon several documents in reaching its override decision. First, plaintiff contends that defendant should not have relied upon the report on Building 3038, AR Tab 13, because that document was more than two years old at the time of the override decision. In addition, plaintiff argues that the e-mail included as part of AR Tab 17 is not evidence, but mere argument and conclusions, and cannot form the basis of defendant's override decision. The court holds that defendant's reliance upon both documents was reasonable.

16. Although not referenced in the D & F, one document in the administrative record also indicates that "Building 3026 is experiencing ground water infiltration and/or water accumulation from precipitation that is accumulating in the Hot Cells and leaching into the ground and surface waters." AR at 554.

AR Tab 13 includes a report issued in March 2008 discussing the condition of Building 3038 and the high levels of radioactive contamination contained in the facility. Plaintiff contends that the document is too old to provide the justification for an override decision purportedly based on urgent and compelling circumstances. However, plaintiff has not disputed any of the information contained in the report, nor has it presented any evidence to contradict the facility manager's assessment that conditions in Building 3038 were worse in June 2010 than when the report was first issued. *See* AR at 341. The court concludes that defendant reasonably relied upon the Building 3038 report and the subsequent assessment of the facility manager in reaching its override decision.

Plaintiff also argues that the transmittal e-mail included as part of AR Tab 17 is not evidence and cannot provide the basis for defendant's conclusion that conditions on the site were getting worse in the months preceding the override decision. Plaintiff contends that defendant must base its override decision upon "evidence" rather than "conclusions" contained in the administrative record. Plaintiff has cited no authority in support of its purported evidentiary dichotomy, and the court is aware of none. In determining whether urgent and compelling circumstances justified an override of the automatic stay, defendant was free to base its decision upon the assessments of its designated staff concerning the condition of Buildings 3026 and 3038.[17] The only potential distinction between the transmittal e-mail in Tab 17 and the other documents contained in the administrative record is that the former was created in anticipation of defendant's override decision. Plaintiff has cited no authority for the proposition that documents created to assist an agency in making an official decision may not be used by that agency in making that decision.

### 4. Defendant's Claims of Heavy Rainfall in the Months Preceding Its Override Decision

In the D & F, defendant states that the condition of Buildings 3026 and 3038 had deteriorated significantly in recent months due to unusually heavy rainfall. Plaintiff disputes defendant's assertion that the ORNL experienced unusually heavy rainfall between March 2010 and July 2010, arguing that the total rainfall in each of those months was lower than the corresponding averages for those months in prior years.[18] However, a low rainfall total for each of those months is not necessarily inconsistent with the occurrence of high-rainfall events during that time period because the total monthly figures do not account for the distribution of rainfall within each of those months. It is clear from the D & F that defendant is concerned primarily with the risk of high-rainfall events, rather than sustained levels of precipitation over a long period of time. AR at 560 (explaining that the "major concern to ORNL and its population is the possibility of a *major rain event* occurring in concert with a contamination event that would spread the contamination beyond the control area and onto Central Avenue and surrounding facilities") (emphasis added).

Plaintiff does not dispute that heavy rainfall has compromised the integrity of the polyurea sealant used on the hot cells. Nor does plaintiff dispute that heavy rainfall caused the migration of significant amounts of radioactive contamination from the hot cells to the adjacent concrete pad and ramp leading to a public street following the removal of the wooden superstructure of Building 3026. On the contrary, plaintiff simply argues that the contamination event in question occurred in January 2010 rather than in May 2010. While that discrepancy might indicate that defendant could have approved an override of the automatic stay triggered

---

17. During oral argument, counsel for defendant noted that Lee McGetrick, the ARRA Portfolio Manager and author of the contested e-mail, provided her assessment in the challenged e-mail based on her technical expertise and the results of her investigation of the condition of the facilities. Counsel described Ms. McGetrick as a technical expert in the field who conducted her own investigation of Buildings 3026 and 3038 and reached her own conclusions, which were reported to the contracting authority.

18. Defendant has conceded that it incorrectly stated that one particular contamination event occurred in May 2010, when the event actually occurred in January 2010.

by PMTech's second bid protest, instead of waiting until the stay imposed by the third protest, it does nothing to undermine defendant's assertion of urgent and compelling circumstances based upon a present or future threat to health, welfare and safety.

Moreover, the precise date of the contamination incident is irrelevant to the likelihood that a similar incident might occur in the future. Plaintiff argues that the risk of radioactive runoff following a high-rainfall event has been eliminated because the principal source of the contamination (*i.e.*, the demolition debris) has been removed from the site. As discussed above, however, the contamination has continued to reappear at high levels in the charging room area of Building 3026. Defendant reasonably concluded that the permanent remediation work contemplated under the task order is necessary to eliminate the risk of a future contamination event.

### D. The Agency Has Advanced a Plausible Explanation for the Override Decision

Finally, the Supreme Court has explained that an agency decision should be held to be arbitrary and capricious if the purported rationale for the decision is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. This court has no trouble concluding that the government has raised a plausible justification for the override decision in this case. In assessing the plausibility of defendant's explanation for its override decision, it is useful to review the facts upon which there is no disagreement.

The parties are in agreement that Building 3026 and Building 3038 are both contaminated with high levels of radiation and other hazardous materials. The parties agree that radioactive contamination is harmful to human health and safety. The parties agree that the wooden superstructure that once protected the radiation containment cells in Building 3026 has been removed, leaving the hot cells unsheltered from the elements. The parties agree that the spread of contamination from the hot cells in Building 3026 has required UT–Battelle to perform multiple decontamination, remediation and repair measures, and there is no dispute between the parties that those measures are intended to be only temporary in nature.

The principal area of disagreement between the parties is the precise risk of postponing the permanent remediation of Building 3026 and Building 3038. Plaintiff asserts that the temporary decontamination and remediation measures implemented by UT–Battelle have successfully prevented the spread of radioactive contamination in the past and will continue to do so in the future. Defendant, on the other hand, contends that further delay of the permanent remediation work will create an unnecessary and unacceptable risk to human health and safety. In short, defendant's decision to override the automatic stay of performance is based upon its considered assessment of the future risks of contamination, and plaintiff simply disagrees with the accuracy of that assessment. However, this court has neither the legal authority nor the institutional competence to substitute its judgment for that of an administrative agency in an area as committed to agency expertise and discretion as the assessment of risks to human health and safety from radioactive and other hazardous materials contamination. The court holds that defendant has advanced a plausible explanation for its override decision.

### CONCLUSION

Plaintiff has not shown that DOE's decision to override the automatic stay of performance was arbitrary, capricious, an abuse of discretion or otherwise contrary to law. Because plaintiff has not succeeded on the merits of its action, the court need not proceed to the question of whether plaintiff has shown that it is entitled to injunctive relief from this court. For the foregoing reasons, plaintiff's cross motion for judgment on the administrative record is denied and defendant's cross motion for judgment on the administrative record is granted. Accordingly, it is hereby **ORDERED** that:

(1) Plaintiff's motion for a preliminary injunction and declaratory relief, filed on July 13, 2010, which the court deems to be Plaintiff's Cross Motion for Judg-

ment on the Administrative Record, is **DENIED**;

(2) Defendant's response in opposition to plaintiff's motion for injunctive relief, filed on July 21, 2010, which the court deems to be Defendant's Cross Motion for Judgment on the Administrative Record, is **GRANTED**;

(3) Plaintiff's Motion for Limited Expedited Discovery, filed on July 13, 2010, is **DENIED** as moot;

(4) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint with prejudice;

(5) On or before **September 10, 2010**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(6) Each party shall bear its own costs.